**Affirmed and Opinion filed August 26, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00168-CR

### PEDRO ERNESTO UMANA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 351st District Court
Harris County, Texas
Trial Court Cause No. 1360048**

## O P I N I O N

In this case, we review the voluntariness of a statement given by a defendant who was subsequently found incompetent to stand trial and then had his competency restored. A jury convicted appellant Pedro Ernesto Umana of aggravated sexual assault, sentenced him to prison for 50 years and assessed a fine of $10,000. Appellant raises three issues on appeal concerning the denial of his motion to suppress, the admission of evidence of the details of an extraneous

offense during the punishment phase, and the sufficiency of the evidence to support the court costs assessed in the judgment. We affirm.

## BACKGROUND

The complainant and two friends were at her apartment when three people forced their way in with a handgun. The intruders were subsequently identified as appellant, his sister and her husband. Appellant held the complainant and her friends at gunpoint while the intruders ransacked the apartment. Appellant directed the complainant into her bedroom while holding her at gunpoint and sexually assaulted her.

The investigation led police to appellant. Approximately 16 hours after the robbery and assault, appellant waived his rights and gave a statement to police that was recorded on video. Three days later, a judge ordered a psychological review of the appellant, as appellant self-reported that he was hearing voices telling him to do bad things and had a prior diagnosis of bipolar disease and schizophrenia. The appellant received medication while in custody.

Five months after the offense, appellant was evaluated for competency by Dr. Stephen McCary pursuant to court order. Dr. McCary found appellant incompetent to stand trial. Appellant was admitted to North Texas State Hospital for psychiatric treatment.

Fourth months later, Dr. Jennifer L. Russell evaluated appellant and found he was competent to stand trial. The trial court found appellant's competency had been restored on November 20, 2011, and his trial began the following September.

Appellant filed a motion to suppress his video-taped statement on the grounds he was unable to voluntarily waive his rights because he was mentally ill.

2

Following a hearing, the trial court denied appellant's motion and the video-taped statement was admitted into evidence and played to the jury.

## MOTION TO SUPPRESS

In his first issue, appellant claims the trial court erred in denying his motion to suppress his custodial statement because it was obtained in violation of his federal and state rights to due process of law and article 38.22 of the Texas Code of Criminal Procedure. *See* U.S. CONST. amend V, VI, XIV; Tex. Const. art. 1, § 10; Tex. Code Crim. Proc. §§ 38.22, 38.23.

## I. Pertinent Law

There are three theories by which a defendant may claim that his statement was involuntary and thus may not be used against him: (1) failure to comply with article 38.22; (2) failure to comply with *Miranda v. Arizona*, 384 U.S. 436 (1966); or (3) violation of due process. *Oursbourn v. State*, 259 S.W.3d 159, 169–72 (Tex. Crim. App. 2008). Under the second and third theories, a confession is involuntary "only when there is police overreaching." *Id.* at 169. Absent police misconduct causally related to the confession, there is no deprivation of due process of law by a state actor and therefore no violation of the Due Process Clause. *Id.* at 170. Likewise, *Miranda* protects against government coercion to surrender Fifth Amendment rights. *Id.* Thus, due-process claims and *Miranda* claims of involuntariness involve an objective assessment of police behavior. *Id.* at 171.

Claims of involuntariness based on the defendant's state of mind are "to be resolved by state laws governing the admission of evidence." *Id.* at 171. That state law in Texas is article 38.22, the Texas Confession Statute. *Id.* Although claims of involuntariness under the Texas Confession Statute may be based on police overreaching, they may also be based on the defendant's state of mind. *Id.*

3

at 172. Whether or not a suspect voluntarily waived the rights set out in article 38.22 § 2(a)[1] or § (3)(a)[2] does not turn solely on the behavior of the police. *Id.* The Texas Court of Criminal Appeals has held that youth, intoxication, mental retardation, and other disabilities are usually not enough, by themselves, to render a statement inadmissible under Article 38.22, but they are factors for the factfinder to consider. *Id*. at 173.

## II. Standard of Review

A bifurcated standard of review is applied to a trial court's ruling on a motion to suppress evidence. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). An appellate court affords almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Id.* The appellate court affords the same amount of deference to a trial court's ruling on mixed questions of law and fact if the resolution of those questions turns on an

---

[1] Section 2 provides "No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that: (a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that: (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial; (2) any statement he makes may be used as evidence against him in court; (3) he has the right to have a lawyer present to advise him prior to and during any questioning; (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and (5) he has the right to terminate the interview at any time; and (b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section." Tex. Code Crim. Proc. art. 38.22 § 2.

[2] Section 3(a) provides, in pertinent part: "No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless: (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement; (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning . . ." Tex. Code Crim. Proc. art. 38.22 § 3(a).

4

evaluation of credibility and demeanor. *Id.* The court reviews de novo those questions not turning on credibility and demeanor. *Id.* At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Mason v. State*, 116 S.W.3d 248, 256 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). If the trial judge's decision is correct under any theory of law applicable to the case, the decision will be sustained. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

The State has the burden of showing, by a preponderance of the evidence, that a defendant knowingly, intelligently, and voluntarily waived his rights. *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). Voluntariness is determined by looking at the totality of the circumstances. *See Griffin v. State*, 765 S.W.2d 422, 427 (Tex. Crim. App. 1989). The totality of the circumstances includes the accused's experience, background, and conduct. *Id.* It also includes the characteristics of the accused. *Davis v. State*, 313 S.W.3d 317, 337 (Tex. Crim. App. 2010) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26 (1973)). The voluntariness of a confession given by a mentally ill person is assessed under the same standard of review, the totality of the circumstances, as that used for a person who is not mentally ill. *Delao v. State*, 235 S.W.3d 235, 241 (Tex. Crim. App. 2007). Whether the accused is mentally ill is but one characteristic among many to consider when evaluating the voluntariness of a confession. *Id.* at 239–40 (stating that juveniles and individuals suffering from mental retardation or mental illness share many of the same characteristics). A confession is involuntary if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will. *Vasquez v. State*, 179 S.W.3d 646, 655 (Tex. App.—Austin 2005), *aff'd*, 225 S.W.3d 541 (Tex. Crim. App. 2007).

## III. The Statement

The video-taped statement shows two officers, Varela and Rivera, questioning appellant. Varela read appellant his rights and asked, "Do you understand all your rights?" Appellant nodded his head up and down and stated, "Uh-huh." According to appellant, he and his sister and brother-in-law followed some drunk people home, took their money, made them take their clothes off so they would not be able to follow them, and restrained them with tape. Appellant said that he thought the tape would hold them only long enough to get away and that, once sober, they could rip it off. Appellant said he did not want to hurt anyone and left a knife on the dresser so that the complainant could free herself.

Appellant said they needed money for rent. Appellant's sister and brother-in-law took a flat screen, a game, and a laptop to the car and they all left.

When asked if he had sexual intercourse with the complainant, appellant denied it and also denied touching her private parts. Rivera informed appellant that his sister and brother-in-law said he had some type of sexual contact with the complainant. Appellant admitted putting a dildo inside of complainant's vagina but denied putting his finger or penis inside her. Rivera told appellant that complainant had gone to the hospital and there would be DNA evidence if he had sexual intercourse with her. Appellant said that his DNA would not be found on complainant because he only used the dildo. Appellant said that he just wanted to see what she did with the dildo. Appellant refused to voluntarily provide a DNA sample. Appellant denied that he made complainant perform oral sex but admitted that he told his brother-in-law that he did.

When asked specifics about how he taped complainant, appellant said he did not remember. Appellant said that he took medication and was bipolar.

6

Near the end of the interview, appellant said what he did with the dildo was the only thing he did "that was stupid, I don't even know why I did that. . . I be having crazy [things] going on in my head . . . I be hearing people talk to me . . . people in my head tell me to do things . . ." Appellant then said that he used the dildo on the complainant because he had never seen anything like that and he wondered why girls used them.

At the end of the interview, appellant asked Rivera what he was being charged with. Appellant provided a number of specific details about the robbery during the course of the interview.

## IV.    The Hearing

A hearing was held on appellant's motion to suppress. The videotape of appellant's statement on January 11, 2011, was admitted and published. The appellant called as witnesses McCary, who entered the courtroom as the video was playing, and Varela. McCary testified that appellant was incompetent to stand trial on June 24, 2011, the date of his evaluation. McCary testified that "competency to stand trial is more of a snapshot in time of where they were at the time. In this case, June 24th, 2011. Does not necessarily indicate their competency months before or their competency months later, but their competency at the time that they are seen." McCary explained that "if a person is found incompetent at a particular point, what the examiner in effect is saying is that they don't think they're able to participate effectively in their legal case or to work with their attorney or to provide a good defense for themselves at that time." He testified that in June 2011, appellant had significant problems, but McCary "would anticipate . . . that he would be able to regain his competency to stand trial." McCary described appellant as follows:

7

He was alert and oriented to place and person. He indicated some confusion about knowing the date and time. Well, that's easy to lose track of in the jail because they don't have clocks and they don't have windows to look out of, and so forth. It's quite frequent that they'll say things like they're in a hospital, or something of that sort, rather than being in jail. And he said something like that.

. . .

[H]e was able to express himself in a way that made sense and that followed from one thought to the next. . . . [H]e was able to communicate with me reasonably well.

McCary testified without objection that, after he entered the courtroom, he watched part of appellant's video-taped statement as it played. McCary testified as follows:

A. The person that I saw in the video is reasonably consistent with what's in the report. Although, I think at the time that he was interviewed he obviously -- what I kept thinking as I watched it is I noted in my competency steps that my clinical impression was that he knew more about his charges than he was willing to admit. And that was my sense of it watching the video.

Q. It appeared that he understood what was being said to him, correct?

A. Yes.

Q. When the officer began -- specifically when he began trying to say that the defendant used his penis to rape the complainant, the defendant was very clear and very strong about the fact that he had not?

A. He kept denying it.

Q. Okay. And he kept saying: Nope, I just used the dildo, just used the dildo, correct?

A. Something to that effect as I recall.

Q. And so that shows that he knew what he was talking about; he wasn't just agreeing with everything the officer said, correct?

A. I -- my judgment, subjectively watching it, is that he knew what

8

was going on. It seemed to me that the questions were being asked maybe addressed issues more pertinent to sanity as opposed to competency, but he seemed to understand what the officer was asking him, yes.

Q. In the video it does not appear as though he's in any way delusional, does it?

A. No

…

Q. He didn't appear to be hallucinating in any way during the video?

 A. No.

Q. He didn't appear to be out of touch with reality in any way?

A. He seemed to understand what was going on.

Q. And he doesn't speak loudly, but he's able to communicate; I mean, he's speaking in sentences and he's making sense, correct?

A. As far as I could tell, yes.

. . .

Q. Okay. And the demeanor that he has in the video is different than the demeanor that he had with you. In the video you can see him having eye contact with the officers, correct?

A. Yes.

Q. And you said in your evaluation that he was -- he did not keep eye contact, correct?

A. Sometimes did not maintain eye contact with me.

Q. So that was different than when he was interviewed by you?

A. A little bit, uh-huh.

Officer John Varela also testified at the hearing on appellant's motion to suppress. Varela read appellant his statutory warnings and asked if he understood and appellant said he did. Varela testified the statement was taken approximately one hour after appellant was taken into custody, that appellant never tried to stop the interview and that appellant stated he did not want to give a DNA sample.

9

Varela testified, "He understood that he had a choice and he made the choice not to take it." Varela said he never felt that appellant did not understand what was going on.

Appellant also introduced into evidence a 21-day order for a psychiatric evaluation, signed January 14, 2011, and two sets of medical records. The order reflects appellant self-reported hearing voices telling him to do bad things and that he had a prior diagnosis of bipolar disease and schizophrenia. The medical records dated before the statement was given demonstrate appellant referred himself to MHMRA of Harris County. The "Wait List Monitoring Assessments" reflect that appellant self-reported that he was treated psychiatrically while in jail three years earlier, where he attempted suicide; he took Lexapro, Depakote, and another unidentified medication; and the doctor talked to him about having bipolar disorder. Appellant also reported that his school said he was ADHD. The report states there is no history of psychiatric related hospitalizations and no prior outpatient psychiatric treatment. Further, the report states he does not meet the criteria for hypomanic or manic episodes.

## V. The Trial Court's Findings and Conclusions

The trial court filed written findings of fact and conclusions of law, summarized as follows:

- At the start of the interview, Varela accurately recited the warnings set out in article 38.22 of the Texas Code of Criminal Procedure, and *Miranda v. Arizona*, 384 U.S. 436 (1966)[3]; Appellant agreed that he understood those

---

[3] Taken together, article 38.22 and *Miranda* require an accused be warned of: his right to remain silent; that any statement may be used against him in court; his right to have a lawyer present; his right to an appointed lawyer if he cannot employ one; and his right to terminate the interview at any time.

10

warnings and did not seek to terminate the interview after hearing the warnings;

- Appellant freely and voluntarily participated in the ensuing conversation and admitted to his participation in the aggravated robbery and to committing the sexual assault of the complainant;

- Appellant was talkative and responsive to questions; gave intelligent answers; offered additional details; and asked questions indicating he understood what Varela was talking about and what the stakes were;

- Appellant understood the difference and gravity when the discussion changed from allegations of robbery to allegations of sexual assault;

- Appellant admitted that he invaded complainant's home and participated in the robbery and explained his motive for the robbery and the choice of complainant and her friends as the targets;

- Appellant admitted he bound the complainant and her friends and made them take off their clothing and explained the reason why;

- When asked about the sexual assault, appellant was initially adamant that he did not commit the rape, but later put his head down and admitted that he had used the dildo to penetrate the complainant's vagina;

- Appellant was not threatened or coerced by anyone to admit he had used a dildo to penetrate the complainant's vagina after his initial denial;

- When asked about DNA, appellant was adamant his would not be found since he did not use his penis and he then refused to provide a DNA sample;

- Appellant did not ask to terminate any of his conversations with the investigating officers or inquire about contacting or obtaining an attorney;

- The officers who came in contact with appellant did not threaten him, make any promise or offer any inducement of any kind to him, or physically abuse or mistreat him;

- Appellant voluntarily participated in his conversation with investigating officers, and he voluntarily provided the video-taped oral statement;

- Appellant knowingly, intelligently and voluntarily gave up and waived the rights set out in article 38.22 of the Texas Code of Criminal Procedure;

- Varela's testimony during the hearing was credible;

- Appellant was evaluated by McCary on June 24, 2011, and found to not be competent to stand trial;

- McCary testified in the hearing that he watched appellant's video-taped interview and believed appellant understood the questions and process of volunteering his statement, evidenced by how adamant he was that he had not put his penis inside the complainant's vagina;

- McCary also noted that the in the video-taped statement, appellant was able to maintain eye contact with the investigators which was different than when he later found the Defendant incompetent to stand trial on June 24, 2011;

- McCary agreed that appellant had a completely different demeanor when he was interviewed by Varela than when he was later determined to be incompetent to stand trial by McCary six months later;

- Appellant did not appear delusional when he was interviewed by Varela according to McCary;

- McCary was a credible witness;

- At the time of his participation in the video-taped interview, appellant was lucid, of sound mind, and capable of understanding the warnings given to him and the nature of his statements;

- Appellant's statement was voluntary;

- Appellant understood the warnings required by article 38.22 of the Texas Code of Criminal Procedure and *Miranda v. Arizona*, 384 U.S. 436 (1966), that were given to him before his interview with Varela;

- Appellant knowingly and intelligently waived those rights before voluntarily participating in the video-taped interview;

- Appellant's mental health issues played no part in his decision to knowingly and intelligently waive his rights and voluntarily participate in the video-taped interview; and

- Appellant's mental health issues that lead to the determination that he was incompetent to stand trial arose after appellant voluntarily participated in the videotaped interview.

Based on its findings of fact, the trial court entered conclusions of law, summarized below:

- Appellant voluntarily provided the video-taped oral statement in the absence of any threats, promises, coercion or other improper inducement on the part of any of the police officers who came into contact with the defendant;

- Appellant's video-taped oral statement was obtained in full compliance with the requirements of article 38.22 of the Texas Code of Criminal Procedure, after he  knowingly and voluntarily gave up and waived the rights set out therein and in *Miranda v. Arizona*, 384 U.S. 436 (1966); and

13

- Appellant's video-taped oral statement is admissible in evidence under articles 38.21 and 38.22 of the Texas Code of Criminal Procedure, and under all applicable provisions of the Texas Constitution and the United States Constitution.

## VI.   Analysis

### A. No police misconduct

Appellant's theory that his statement was involuntary is based upon his state of mind, not police misconduct.  The evidence in the record does not reflect any overreaching or misconduct on the part of the police and appellant does not argue that any occurred.  The trial court's findings and conclusions to that effect are supported by the evidence adduced at the hearing, including the video-taped statement. *See Oursbourn*, 259 S.W.3d at 169–71.

### B. No express waiver of rights needed

Appellant's theory that his statement was involuntary because of his mental illness is properly reviewed for failure to comply with the Texas Confession Statute. *See Oursbourn*, 259 S.W.3d at 171.  Article 38.22 of the Code of Criminal Procedure provides that no oral statement of an accused made as a result of custodial interrogation shall be admissible unless the statement was recorded and, prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights.  Tex. Code Crim. Proc. art. 38.22 § 3.

The statement was recorded and the State does not contest it was made as a result of custodial interrogation.  Appellant does not contest that he was warned of his rights, prior to the statement but during the recording, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and Tex. Code Crim. Proc. art. 38.22.  Appellant

14

does claim that he did not explicitly or expressly waive his rights. He points out that after Varela read him his rights and asked if he understood those rights, appellant responded, "Uh-huh." Varela then began questioning appellant without asking him whether he waived his rights.

An express waiver is not required. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). Although a valid waiver is not presumed, either from the silence of the accused after warnings are given or from the fact that an admission is obtained, it can be inferred from the actions and words of the interrogated person. *Id.*

Appellant made no argument in the trial court that he had not waived his rights. Accordingly, the issue is not preserved for appeal. *See Leza,* 351 S.W.3d at 353. In any event, it is within the trial court's discretion to rely upon an implied waiver when the totality of the circumstances, as reflected by the recording of the oral statement, supports it. *Id.* If the recording shows the warnings were received and understood by the accused and he does not invoke his rights, the accused waived the right to remain silent by making an uncoerced statement to the police. *Id.* at 354 n. 33 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 388–89 (2010)).

The recording of the oral statement shows Varela read appellant his rights and asked, "Do you understand all your rights?" Appellant nodded his head up and down and stated, "Uh-huh." Thus the record shows the warnings were given and appellant affirmatively indicated that he understood those warnings. The recording further reflects that appellant did not invoke his rights at any time during the interrogation. We therefore conclude the totality of the circumstances supports the trial court's reliance upon appellant's implied waiver of his rights.

## C. Incompetency

The issue before us, therefore, is not whether appellant waived his rights, but whether he did so knowingly, intelligently, and voluntarily. Appellant claims the evidence showed he suffered from untreated mental illness before his arrest and interrogation and was not restored to competency until eleven months after his arrest.

Appellant asserts the State offered no evidence that he understood his rights and knowingly, voluntarily and intelligently waived them.[4] We disagree. McCary testified that appellant's lack of competency in June of 2011 did not necessarily indicate that he was incompetent before that time. McCary testified that it appeared appellant understood what was being said to him on the video. According to McCary, appellant "knew what was going on. . . [and] he seemed to understand what the officer was asking him. . .." McCary testified appellant did not appear to be hallucinating or out of touch with reality during the video. Again, McCary said, "He seemed to understand what was going on." McCary also agreed that appellant was able to communicate; he was speaking in sentences and made sense. McCary testified that appellant had eye contact with the officers in the video but when he evaluated appellant in June, appellant did not maintain eye contact with him.

Varela testified that appellant understood he could choose whether to provide a DNA sample and made the choice not to give a sample. Varela said he never felt appellant did not understand the proceedings.

---

[4] The State contends appellant failed to present evidence that raised a voluntariness question. However, the record reflects the trial court's charge to the jury included an instruction on voluntariness of appellant's statement, pursuant to section 6 of article 38.22 of the Texas Code of Criminal Procedure. We find the record supports the trial court's determination that the question was raised.

The video-taped statement is also evidence of appellant's state of mind at that time. The trial court viewed the video and from it was able to assess appellant's state of mind. To the extent appellant is arguing the State was not the sponsor of the evidence, that fact is not determinative. Evidence was presented and it either preponderates in favor of the trial court's determination or does not.

We find it does. Although appellant said at the close of the interview that he hears people talking to him and they tell him to do things, he did not claim, and there is no indication in the 47-minute interview, that he was having such an experience at the time of the interview. The subsequent finding of incompetency is a relevant factor to determining whether appellant's waiver was voluntary but it is not conclusive. In contrast to the later finding of incompetency is appellant's participation in the interview, which became more active as it continued, that demonstrates he understood the situation. Appellant's attempts to minimize his actions reflect his knowledge of the potential consequences, as does his refusal to provide a DNA sample. The level of detail appellant was able to provide regarding his actions during the robbery and assault reveal that he was capable of understanding his rights before waiving them. The trial court's findings and conclusions that appellant's waiver was made knowingly, voluntarily and intelligently are supported by the video-taped statement, as well as the evidence adduced at the hearing.

Applying the appropriately deferential standard of review, we conclude the totality of the circumstances demonstrates, by a preponderance of the evidence, appellant's waiver of his rights was voluntarily made with full awareness of the nature of those rights and the consequences of waiving them. *See Joseph*, 309 S.W.3d at 26–27. Accordingly, we find the trial court did not abuse its discretion in denying appellant's claims in his motion to suppress that his statement was

involuntary for failure to comply with the Texas Confession Statute. *See Oursbourn*, 259 S.W.3d at 171. Appellant's first issue is overruled.

## ADMISSION OF EVIDENCE DURING PUNISHMENT PHASE

Appellant's second issue argues the trial court abused its discretion in admitting evidence during the punishment phase of an alleged aggravated robbery for which appellant had pleaded guilty to deadly conduct. The State gave notice before trial that it would offer evidence of a prior conviction for deadly conduct and would call the complainants to testify about the offense. At trial, defense counsel objected that she was not given notice the State intended to offer the complainants' testimony to prove appellant had committed aggravated robbery, not merely deadly conduct. Counsel also objected on the grounds the State was collaterally estopped from proving appellant committed aggravated robbery. The State responded the evidence was not being offered to prove the extraneous offense of aggravated robbery, but as evidence to be used in determining the appropriate punishment. The trial court overruled defense counsel's objections.

Article 37.07 allows the details of prior offenses to be admitted during punishment and provides a trial court with broad discretion in admitting whatever evidence it deems relevant to sentencing. Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1) (West Supp. 2013); *Davis v. State*, 968 S.W.2d 368, 373 (Tex. Crim. App. 1998). During punishment, "relevant evidence is that which assists the fact finder in determining the appropriate sentence given the particular defendant in the circumstances presented." *Davis v. State*, 68 S.W.3d 273, 282-83 (Tex. App.—Dallas 2002, pet. ref'd). From such evidence, jurors learn information that is useful in deciding the most appropriate punishment under the circumstances. *Haney v. State*, 951 S.W.2d 551, 555 (Tex. App.—Waco 1997, no pet.). In this case, the facts surrounding appellant's previous conviction were relevant to assist

18

the jury in determining the appropriate punishment of appellant for the offense in the instant case, aggravated sexual assault. *See Davis,* 68 S.W.3d at 283 (upholding admission of details of prior conviction because it was "extremely instructive concerning appellant's character" and helped to "aid the trial court in setting punishment").

Collateral estoppel bars retrial of any specific and discrete facts that have been fully and fairly adjudicated. *Ex parte Watkins*, 73 S.W.3d 264, 267 (Tex. Crim. App. 2002). Appellant claims the State is attempting to relitigate the facts of his prior conviction to show the occurrence of a greater offense. Appellant has offered no authority, and we are aware of none, that collateral estoppel applies to the punishment phase to bar the details of prior offenses or bad acts and we decline to hold it applicable in this case.

Accordingly, we conclude the trial court did not abuse its discretion in admitting evidence of the details of appellant's prior conviction. Appellant's second issue is overruled.

## COURT COSTS

Issue three asserts there is insufficient evidence to support the court costs of $639 reflected in the judgment. We review the assessment of court costs on appeal to determine if there is a basis for the costs, not to determine whether there was sufficient evidence offered at trial to prove each cost. *See Johnson v. State*, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014). Traditional sufficiency-of-the-evidence standards of review do not apply. *Id.*

Generally, a bill of costs must (1) contain the items of cost, (2) be signed by the officer who charged the cost or the officer who is entitled to receive payment for the cost, and (3) be certified. *Id*. at 392–93; *see* Tex. Code Crim. Proc. arts.

19

103.001, 103.006.  The record in this case contains a computer-screen printout of the Harris County Justice Information Management System (JIMS) "Cost Bill Assessment."  In *Johnson*, the Court of Criminal Appeals held that a JIMS report constitutes an appropriate bill of costs because the report itemized the accrued court costs, was certified by the district clerk, and was signed by a deputy clerk. *Johnson*, 423 S.W.3d at 393.  The JIMS report in this record is a compliant bill of costs because it contains an itemized list of costs, is certified by the district clerk, and is signed by a deputy district clerk.  *See id*. at 392–93.  The fact that the bill of costs was not prepared until after the court signed the judgment does not defeat the lawfulness of the bill of costs.  *Id.* at 394.  ("[M]atters pertaining to the imposition of court costs need not be brought to the attention of the trial court, including a bill of costs prepared after a criminal trial.").

The trial court assessed $639 in costs against appellant.  The sum of the itemized costs in the JIMS report is $639.  There being no challenge to any specific cost or the basis for the assessment of such cost, the bill of costs supports the costs assessed in the judgment.  Appellant's third issue is overruled.

Having overruled all of appellant's issues, the judgment of the trial court is affirmed.

/s/    Martha Hill Jamison
        Justice

Panel consists of Justices Christopher, Jamison, and McCally.
Publish — Tex. R. App. P. 47.2(b).