**Opinion issued December 19, 2019.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00422-CR

———————————

**AGUSTIN CALDERON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case No. 15CR3346**

---

## MEMORANDUM OPINION

A jury convicted appellant Agustin Calderon of the offense of capital murder.[1]

Because the State did not seek the death penalty, the trial court automatically

---

[1]    *See* TEX. PENAL CODE § 19.03(a)(7).

assessed appellant's punishment at confinement for life.[2] In a single issue on appeal, appellant argues that the trial court erred in denying his motion to suppress his statement to police because the State failed to prove that his waiver of his *Miranda*[3] rights was done knowingly, intelligently, and voluntarily. Finding no reversible error, we affirm the trial court's judgment.

## Background

Nancy Shuffleberger saw appellant running through her fenced-in backyard around 9:45 one morning. When she confronted him, he apologized and raised his hands in the air. After she confirmed that appellant spoke English, Shuffleberger asked appellant if anyone was chasing him, and if he wanted her to call the police. Appellant answered affirmatively. Appellant also told her several times that he needed advice.

Officer Anders, who was wearing a body camera, and two other officers answered Shuffleberger's 9-1-1 call. The video captured by Officer Anders's body camera reflects that one officer interviewed the homeowner while Officer Anders and the other officer searched appellant and questioned him. Appellant, who did not have any identification with him, told Officer Anders that his name was "Cruz" and he lived on Spruce Street. He also told the officer that he needed advice.

---

[2]    *See* TEX. PENAL CODE § 12.31(a)(2).

[3]    *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Officer Anders asked appellant if he had been drinking or smoking anything and appellant told him that he drank beer that morning. When asked why he was at Shuffleberger's home, appellant told Anders that he was running. Officer Anders asked appellant who he was running from, but appellant's response was inaudible. Officer Anders also asked appellant if he had any mental disabilities. Appellant responded that he did not. The officer told appellant that he was checking to see if he was okay because he was "running around and hiding from apparently nothing."

Appellant told Officer Anders that he needed help and Anders responded that he could not help appellant without more information. After he confirmed that appellant spoke "good English," Officer Anders told appellant to talk to him and the other officer and tell them what was going on. Appellant told Officer Anders that people were after him, but he did not know why. Most of appellant's statements to the other officer, however, were inaudible. After speaking with appellant, the other officer handcuffed him and placed him under arrest for public intoxication.

Approximately ten seconds after appellant was arrested, Officer Anders heard a call over his police radio that there was a "possible DOA" at "1215 Spruce." Officer Anders asked appellant where he lived, and after appellant responded, Officer Anders told the arresting officer that was the "same area, the same spot."

Officer Anders then drove to 1215 Spruce. According to his body camera video, the drive took less than two minutes. When he arrived at the scene, Officer

Anders observed a female (later identified as the victim Stephanie Falcon) lying on the living room floor of a downstairs apartment who appeared to be deceased. Witnesses who were waiting outside the building told Officer Anders that Stephanie and "Cruz" lived in the apartment where Stephanie's body was found. After speaking with the witnesses, Officer Anders told another officer at the scene that the man he spoke to outside Shuffleberger's home was named "Cruz" and that Cruz was "really nervous" and appeared to be high or drunk. Officer Anders testified that he believed that it was "highly likely" that the two locations and the two individuals were going to be connected.

Appellant, who had been in police custody since 10:00 a.m., gave a videotaped statement to the lead investigator, Detective Walton, at 5:15 p.m.

Detective Walton read appellant his *Miranda* rights from a form at the beginning of the videotaped interview. He then asked appellant if he understood what he had just heard; appellant did not answer. Detective Walton then read the waiver portion of the form to appellant, handed appellant the form and a pen, and told appellant to sign his name at the bottom. Instead of signing, appellant began reading the form out loud to himself in English. A few moments later, appellant asked Detective Walton, "So what is this for?" Detective Walton told appellant that the rights that he had just read to appellant were listed on the form and that by signing the form, appellant would be admitting that he understood those rights. Appellant

4

then starts talking to himself in Spanish. At that point, Detective Walton reiterated that by signing the form, appellant would be acknowledging that he understands the rights that were read to him. Appellant continued to read the form, sometimes out loud in a muffled tone. Detective Walton asked appellant, "What is Stephanie to you?", but appellant ignored him and continued to read the form. Detective Walton appeared to grow impatient, and told appellant, "Are you going to sign it and talk to me and give me a statement about what is going on? It's up to you." He later asked appellant if he was going to sign the waiver and took the form out of appellant's hands and laid it on the table in front of appellant. "Here's the pen, man. You can make a decision whether you are gonna talk to me or not." Appellant then asked Detective Walton, "what is this about?" Walton told appellant that he wanted to know what was going on between appellant and Stephanie.

Appellant started fidgeting in his chair and asked Walton to explain again what the interview was about and if there were any charges. Walton told appellant that he had not been charged with anything and that "[t]his has nothing to do with charges." Walton reiterated that he just wanted to know what had happened. Appellant continued to stare at the form and either talk to himself or read the form out loud under his breath. "You gonna sign it, or what, man?" Appellant began reading the form out loud in English again. At that point, Detective Walton stated,

"you're reading it, so you obviously understand what it says." Appellant continued to read the form.

Detective Walton told appellant it was not as difficult as he was making it, and that it was "a simple paper, it's a simple document." "So either you are going to sign and talk to me or you're not. It's not a big deal." Appellant continued to read the form and he signed the waiver about nine and a half minutes after the interview began.

After appellant signed the waiver form, Detective Walton stated, "Tell me about Stephanie. What is Stephanie to you?" Detective Walton then identified himself and appellant for the record and stated that "this is in reference to a deceased person at [appellant's] residence." Appellant told Detective Walton that he and Stephanie lived together, she was pregnant, and he and Stephanie had been fighting the night before. Less than fifteen minutes after he waived his rights, appellant admitted to Detective Walton that he choked Stephanie two or three times with his hands while they were on the couch in the living room. He also demonstrated how he choked Stephanie and held her nose.[4] According to appellant, Stephanie passed out after he choked her, but she was fine. Early in the interview, appellant asked

---

[4] At trial, the medical examiner testified that Stephanie was pregnant when she was killed and that her cause of death was manual strangulation. He further testified that Stephanie's unborn child died when Stephanie died, and that the child's cause of death was asphyxia.

Walton if they could "do this tomorrow." Appellant did not otherwise indicate that he no longer wanted to talk to Walton, and he continued to talk to Walton for over an hour. Appellant was subsequently charged with capital murder. *See* TEX. PENAL CODE § 19.03(a)(7).

Appellant filed a motion to suppress his custodial statement. Detective Walton was the only witness to testify at the pre-trial suppression hearing. The videotaped interview and the written statutory warnings and waiver signed by appellant were the only evidence admitted during the hearing. The trial court denied the motion.

At the suppression hearing, Detective Walton testified that he read appellant the required warnings under Article 38.22[5] and that appellant read the waiver out loud to himself in English, although he also spoke to himself in Spanish at some points. Appellant eventually signed the waiver form. Detective Walton testified that he never determined appellant's education level or reading ability. He also testified that he did not know whether English was appellant's first or second language, but he had spoken to Stephanie's mother before the interview and she told him that appellant spoke English. He also testified that it was clear to him that appellant could read and understand English because appellant read the waiver out loud and in English, and he signed the form. Walton testified that the interview was conducted "a good length of time" after Stephanie's body was found and that there was no

---

[5]     TEX. CODE CRIM. PROC. art. 38.22, § 3.

indication that appellant might be under the influence. According to Walton, appellant did not smell of alcohol or have red, bloodshot, or glassy eyes or slurred speech.

Walton denied interrupting appellant while he was reading the waiver form and testified that, based on appellant's behavior, he believed that appellant was stalling. When asked about his statement to appellant that the waiver form was "a simple paper, it's a simple document," Walton testified that he was not referring to appellant's constitutional rights as being simple. Walton testified that the matter was simple because appellant could either speak with him, or not, and if appellant refused to speak to Walton, the interview was over. Walton testified that appellant understood his rights because he signed the form. Appellant signed the waiver nine and a half minutes after the interview began.

Detective Walton offered similar testimony at trial. He also denied pressuring appellant to provide a statement, promising him anything in return for a statement, or denying appellant food, drink, water, or access to a bathroom. He also testified that when he spoke to appellant, appellant was only a person of interest in the murder investigation. Walton testified that he had trouble hearing appellant at times because appellant would speak in a soft, muffled tone.

The video reflects that appellant never told Detective Walton that he did not speak, read, or understand English. Appellant also never told Detective Walton that

8

he did not understand the statutory rights that Detective Walton had read to him, or that he was having trouble comprehending anything that Detective Walton had said. At no point during the interview did appellant tell Detective Walton that he only understood Spanish or request the aid of an interpreter.

At trial, appellant testified in English without the aid of an interpreter and answered all question asked of him in English. Appellant testified that he had been smoking marijuana and drinking beer and vodka the night before Stephanie's body was discovered and that he took a shot of vodka when he woke up around 8:00-8:30 a.m. When he walked out of the bedroom, he saw Stephanie lying on the living room floor. Appellant was scared because he did not know what had happened and he ran to a nearby Valero store to call 9-1-1, but he did not make the call. He testified that he knew the police would blame him for Stephanie's death and he did not know what to do. Appellant claimed that he saw two guys staring and pointing at him after he left the Valero and he thought they were chasing him, so he decided to run directly to the police station. He was running through Shuffleberger's yard when she confronted him and called 9-1-1.

As relevant here, appellant testified that he did not understand the rights he was waiving when he first spoke to Detective Walton because he "was highly, highly intoxicated" and, therefore, he did not have use of normal mental faculties. Appellant

testified that Detective Walton repeatedly interrupted him, prevented him from reading the form, and badgered him into signing the form.

The jury convicted appellant of capital murder and this appeal followed.

## Admission of Custodial Statement

In his sole issue, appellant argues that the trial court erred in denying the motion to suppress his statement to police because the State failed to prove that he waived his *Miranda*[6] rights knowingly, intelligently, and voluntarily. Specifically, appellant argues that the evidence demonstrates that he did not understand the waiver form or the rights he would be forfeiting by signing the form because he was intoxicated during the interview and English is not his first language. He further contends that his waiver was not knowing or voluntary because Detective Walton lied to him about the nature and purpose of the interview when he told appellant that the waiver of rights had nothing to do with charges, and Detective Walton repeatedly pressured him to sign the form.

### A.    Standard of Review

We review a trial court's denial of a motion to suppress for an abuse of discretion and apply a bifurcated standard of review. *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016). We afford almost complete deference to the trial court's determination of historical facts, especially the court's determinations that are based

---

[6]    *See Miranda*, 384 U.S. at 479.

10

on the assessment of credibility and demeanor. *Id.*; *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). This same deferential standard of review "applies to a trial court's determination of historical facts [even] when that determination is based on a videotape recording admitted into evidence at a suppression hearing." *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)).

We conduct a de novo review of mixed questions of law and fact that do not hinge on determinations of credibility or demeanor. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016) (citing *Crain*, 315 S.W.3d at 48); *see also Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013) (stating that application of legal principles to specific set of facts is issue of law that appellate courts review de novo). When, as here, the trial court makes written fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the fact findings. *Johnson*, 414 S.W.3d at 192. We will sustain the trial court's ruling if it is correct under any applicable theory of law. *Furr*, 499 S.W.3d at 877.

In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). However, this general rule is inapplicable

where the suppression issue has been consensually relitigated by the parties during the trial on the merits. *Id.* Here, the record reflects that part of the defense's trial strategy was to attack the voluntariness of appellant's statement to Detective Walton. Appellant challenged the voluntariness of his waiver through his trial testimony and his counsel's cross-examination of Detective Walton. Furthermore, the trial court instructed the jury that it could not consider appellant's confession unless it found beyond a reasonable doubt that he gave it freely and voluntarily. Because the suppression issue was relitigated by the parties during trial, we consider both the evidence adduced at the suppression hearing and the evidence admitted at trial in reviewing the trial court's suppression ruling. *See id.*

**B. Applicable Law**

The State has the burden of showing, by a preponderance of the evidence, that a defendant knowingly, intelligently, and voluntarily waived his rights. *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). A waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 349–50 (citations omitted). We determine voluntariness by looking at the totality of the circumstances surrounding the making of the statement. *See Griffin v. State*, 765 S.W.2d 422, 427 (Tex. Crim. App. 1989).

Next, "[i]t will suffice to render a waiver knowing and intelligent . . . that the accused has been made aware, and fully comprehends, that he has the right to remain silent in the face of police interrogation and to discontinue the dialogue at any time, and that the consequence of his waiver is that his words may be used against him later in a court of law." *Leza*, 351 S.W.3d at 350.

A criminal defendant may argue that his statement was not freely and voluntarily made—and, therefore, not admissible as evidence—under several theories: (1) Texas Code of Criminal Procedure article 38.22, section 6, concerning "general voluntariness"; (2) *Miranda*, as expanded by article 38.22, sections 2 and 3; or (3) the Due Process Clause. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008); *see* TEX. CODE CRIM. PROC. art. 38.22, §§ 2, 3, 6; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (holding that statements of accused that are products of custodial interrogation may not be used unless, prior to questioning, accused is warned of certain rights and accused waives those rights, knowingly, intelligently, and voluntarily). "A statement that is involuntary as a matter of constitutional law is also involuntary under Article 38.22, but the converse need not be true." *Oursbourn*, 259 S.W.3d at 169 (internal citations omitted).

Under federal law, a statement is involuntary "only when there is police overreaching." *Id.*; *see also Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Absent police misconduct causally related to the statement, there is no deprivation of due

13

process of law by a state actor and therefore no violation of the Due Process Clause. *Oursbourn*, 259 S.W.3d at 170 (citing *Connelly*, 479 U.S. at 164); *Umana v. State*, 447 S.W.3d 346, 350 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Similarly, *Miranda* only protects against government coercion to surrender Fifth Amendment rights. *Oursbourn*, 259 S.W.3d at 170 (citing *Connelly*, 479 U.S. at 170); *Umana*, 447 S.W.3d at 350. Thus, due process claims, and *Miranda* claims of involuntariness involve an objective assessment of police behavior. *Oursbourn*, 259 S.W.3d at 171; *Umana*, 447 S.W.3d at 350.

Claims of involuntariness based on the defendant's state of mind when making a statement to police are "to be resolved by state laws governing the admission of evidence." *Oursbourn*, 259 S.W.3d at 171 (quoting *Connelly*, 479 U.S. at 170). In Texas, that law is article 38.22, the Texas Confession Statute. *Oursbourn*, 259 S.W.3d at 171; *Umana*, 447 S.W.3d at 350. Under Code of Criminal Procedure article 38.22, section 3(a)(2), before an oral recorded statement may be admitted into evidence, the State must show, *inter alia,* that the accused was properly admonished about his rights and he knowingly, intelligently, and voluntarily waived those rights. TEX. CODE CRIM. PROC. art. 38.22, § 3(a)(2). Claims of involuntariness under article 38.22 can be predicated on both police overreaching and on the defendant's state of mind. *See Oursbourn*, 259 S.W.3d at 172; *Allen v. State*, 479 S.W.3d 341, 350 (Tex. App.—El Paso 2015, no pet). The question to be asked is "[d]oes it appear—as

14

Article 38.21 requires—that the statement was freely and voluntarily made without compulsion or persuasion?" *Oursbourn*, 259 S.W.3d at 172; *see Allen*, 479 S.W.3d at 350. Intoxication is one factor that courts can consider in determining whether a statement was voluntary. *Oursbourn*, 259 S.W.3d at 173; *Allen*, 479 S.W.3d at 350.

**C.    Discussion**

Appellant argues that his waiver was neither knowing nor voluntary because the evidence demonstrates that he did not understand the waiver form or the rights he would be forfeiting by signing the form because he was intoxicated during the interview and English is not his first language. Appellant further argues that Detective Walton pressured him to sign the form and he lied to appellant about the nature and purpose of the interview when he told him that the waiver of rights had nothing to do with charges.

To the extent that appellant is arguing that his statement was involuntary under federal law due to his intoxication and his English language proficiency, such arguments are foreclosed as a matter of law because neither circumstance is attributable to any police misconduct. *See Leza*, 351 S.W.3d at 351. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Connelly*, 479 U.S. at 170. If appellant's mental status, including his intoxication, alone impelled him to confess, that is of no constitutional consequence. *See id.*

A claim that a waiver of the statutory rights enumerated in Article 38.22, however, "need not be predicated on police overreaching." *Leza*, 351 S.W.3d at 353 (quoting *Oursbourn*, 259 S.W.3d at 172). Circumstances, such as intoxication, that are unattributable to the police but which adversely impact an accused's ability to resist reasonable police requests that he waive his statutory rights are "factors" in the voluntariness inquiry. *Leza*, 351 S.W.3d at 353. However, they "are usually not enough, by themselves, to render a statement inadmissible under Article 38.22 [.]" *Leza*, 351 S.W.3d at 353 (quoting *Oursbourn*, 259 S.W.3d at 173). Appellant's alleged intoxication and English proficiency are also relevant with respect to whether this *Miranda* waiver was knowing and intelligent and therefore inadmissible under either federal or state law. *See Leza*, 351 S.W.3d at 352–53.

Detective Walton testified that Stephanie's mother informed him before the interview that appellant spoke English. Walton also testified that he believed that appellant could read and understand English because appellant read the waiver out loud in English. The trial court found Walton's testimony to be credible. The videotape reflects that appellant read portions of the waiver form out loud and in English. Although appellant briefly spoke to himself in Spanish, the entire interview was conducted in English, and appellant never asked for a translator, or otherwise indicated that he did not understand Detective Walton's questions. Notably, appellant also testified at trial in English without the aid of an interpreter and he

16

answered all question asked of him in English. To the extent that there are conflicts in the evidence with respect to appellant's ability to read and understand English, it was within the trial court's province to resolve any such conflicts.

Relying on the videotape[7] of his interaction with Officer Anders, appellant argues that his impaired mental state should have been apparent to Detective Walton because Officer Anders realized that appellant was impaired within a minute of talking to him, as evidenced by the fact that he asked appellant if he had been drinking or smoking anything or if he had any mental disabilities. The record reflects that appellant spoke to Officer Anders around 9:45 a.m. but appellant did not meet with Detective Walton until 5:00 p.m. that afternoon. Detective Walton testified that he did not believe appellant was intoxicated or see any signs that appellant was intoxicated when he interviewed him. The trial court found Walton's testimony to be credible. It was within the trial court's province to resolve any conflicts in the evidence.

We further note that the videotaped statement is also evidence of appellant's state of mind at the time of the interview. The trial court viewed the video and from it was able to assess appellant's state of mind when he signed the waiver, including the degree to which appellant appeared to be intoxicated and appellant's ability to

---

[7]     Officer Anders did not testify at the suppression hearing and the video taken by his body camera was not admitted into evidence during the hearing.

read and comprehend English. *See Umana*, 447 S.W.3d at 357. We defer to the trial court's resolution of these historical facts.

With respect to Detective Walton's allegedly coercive conduct, the record reflects that Detective Walton read appellant his *Miranda* rights at the beginning of the videotaped interview and appellant signed the form approximately nine minutes later. The entire interview lasted approximately one and a half hours. Appellant was never handcuffed or threatened, and no promises were made to induce him to talk to Detective Walton. Appellant was not denied food, water, or bathroom breaks, and he was advised of his rights prior to signing the form. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (observing that in determining whether defendant's will was overborne in particular case, courts should consider circumstances of interrogation, including detention's length, repeated and prolonged nature of questioning, and whether physical punishment, such as deprivation of food or sleep, occurred).

Appellant contends that Detective Walton repeatedly interrupted him while he was trying to read the form, he did not allow appellant to read the entire form, and that he only signed the form because Detective Walton kept telling him to sign it. Walton, however, testified that appellant appeared to understand the form because appellant had read it out loud and in English and that he believed that appellant was just stalling. He admitted at trial, however, that appellant's conduct could also be

18

interpreted as "trying to read and understand the document and make a decision." Walton denied interrupting appellant and testified that appellant was able to read the entire form before he signed it. Walton also denied pressuring appellant to waive his rights. The trial court found Detective Walton credible. It was within the trial court's province to resolve conflicting testimony.

The videotaped statement is also evidence of Detective Walton's conduct during the interview and his interactions with appellant. The trial court viewed the video and from it was able to assess the extent to which Detective Walton pressured or otherwise coerced appellant to sign the form. *See Umana*, 447 S.W.3d at 357. We further note that none of the alleged misconduct in this case rises to the level of police overreaching that courts have held sufficient to render a suspect's statement involuntary. *See Oursbourn*, 259 S.W.3d at 170–71 (listing examples of police overreaching); *see also Allen*, 479 S.W.3d at 351 (citing to *Oursbourn* and stating that "police overreaching that renders a statement involuntary and inadmissible involves extreme fact scenarios").

With respect to Detective Walton's alleged deception, the record reflects that Detective Walton read appellant his *Miranda* rights at the beginning of the video-taped interview, and this included the warning that "anything you say can be used as evidence against you in court." Although Walton told appellant before he signed the waiver that he had not been charged with anything and that "[t]his has nothing to do

19

with charges," Detective Walton's statement, alone, is insufficient, as a matter of law, to render appellant's waiver either involuntary or insufficiently informed. *See Leza*, 351 S.W.3d at 350; *see Colorado v. Spring*, 479 U.S. 564, 577 (1987) ("This Court's holding in *Miranda* specifically required that the police inform a criminal suspect that he has the right to remain silent and that *anything* he says may be used against him. There is no qualification of this broad and explicit warning.") (emphasis in original); *Murphy v. State*, 100 S.W.3d 317, 322 (Tex. App.—San Antonio 2002, pet. ref'd) (stating that it is "not critical that a suspect know the charges to which he is susceptible" and "[s]o long as the suspect understands the basic principles that he has the right to remain silent and whatever he says can be used as evidence against him, his waiver is constitutionally adequate"). This court has found that similar police conduct did not violate a defendant's due process rights. *See generally Snow v. State*, 721 S.W.2d 943, 946 (Tex. App.—Houston [1st Dist.] 1986, no pet.) (holding police officer's statement to defendant that he "was being interviewed only as a witness" did not render defendant's statement involuntary).

Applying the required deferential standard of review, we conclude that the totality of the circumstances demonstrates, by a preponderance of the evidence, appellant's waiver of his rights was voluntarily, knowingly, and intelligently made with full awareness of the nature of those rights and the consequences of waiving

them. *See Umana*, 447 S.W.3d at 357–58. Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's motion to suppress.

We overrule appellant's sole issue.

## Conclusion

We affirm the trial court's judgment.


Russell Lloyd
Justice


Panel consists of Justices Lloyd, Kelly, and Countiss.

Do Not Publish.   TEX. R. APP. P. 47.2(b).