**Christine Marie PAOLILLA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–08–00963–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

May 26, 2011.

Allen C. Isbell, Houston, for appellant.

Jessica Alane Caird, Houston, for state.

Panel consists of Justices SEYMORE, BOYCE, and CHRISTOPHER.

## SUBSTITUTE OPINION

TRACY CHRISTOPHER, Justice.

Appellant Christine Marie Paolilla filed a petition for discretionary review. Pursuant to Texas Rule of Appellate Procedure 50, we withdraw our opinion of March 3, 2011, and issue this substitute opinion in its place.

Appellant was convicted of capital murder. She was seventeen years old at the time of the offense, and therefore ineligible to receive the death penalty. *See* Tex. Penal Code § 8.07(c) (West 2010). Because the State could not seek capital punishment, she was sentenced to a mandatory term of life imprisonment instead. On appeal, she challenges the constitutionality of her sentence, the denial of her motion to suppress, and the denial of her motion for mistrial. We affirm.

## FACTS

Four people were murdered in a Clear Lake home during the afternoon of July 18, 2003. The home belonged to Tiffany Rowell, who was counted among the four complainants. The other three were her friends Rachel Koloroutis, Marcus Precella, and Adelbert Sanchez.

Nearly three years after the offense, police received a tip through Crime Stoppers linking the homicides to appellant and her then-boyfriend, Christopher Lee Snider. A warrant was secured for appellant's arrest in San Antonio, where she had been staying in a hotel with her husband, Stanley Justin Rott.

### The Arrest and Appellant's Recorded Statements

The warrant was executed at 11:55 a.m. on July 19, 2006. When police entered the hotel room, they were met with evidence that the occupants had been using substantial amounts of heroin. Hundreds of used syringes littered the room. Appellant was wearing a t-shirt stained with blood, and several needle marks could be found over her body.

Appellant was escorted to the San Antonio Police Department, where she agreed to a video-taped interview at 2:45 p.m. During the interrogation, appellant admitted to driving Snider to Rowell's house on the day of the offense. She said they originally went there to purchase drugs, but they made a return trip when Snider complained of forgetting something. Appellant insisted that Snider went into the house by himself on both occasions while she remained in the car. When Snider returned the second time, she saw him running with a gun in his hands. She denied ever hearing any gunshots.

The interrogation ended at approximately 3:50 p.m. Appellant, however, remained alone in the interview room as the recorder continued to tape. In the ensuing minutes, her condition clearly began to deteriorate. She grew visibly tired, appearing weak and sick. The recording ended just after 3:58 p.m., when appellant requested to see a nurse, claiming she was bleeding.

Appellant was transported to Santa Rosa Hospital in San Antonio at approximately 4:12 p.m. Medical records indicate she was currently menstruating, but no other signs of bleeding were reported. Appellant did present, though, with a chief complaint of heroin withdrawal. She informed doctors that she was accustomed to taking heroin every ten to fifteen minutes, and that her last injection was roughly 10:00 a.m. that morning. At 5:30 p.m., appellant was administered six milligrams of morphine and twenty milligrams of Methadone.

Using only an audio recorder, interrogators continued their interview inside the hospital at 6:15 p.m. During this session, appellant again denied ever entering the home. She stated, however, that a fight erupted inside, with Snider admitting to shooting all four complainants. The interview concluded at 7:15 p.m. At approximately 9:00 p.m., just before her discharge, appellant received additional dosages of morphine and Methadone.

Appellant was flown to Houston later that evening. She slept on the flight and through part of the next day after being placed in a jail cell. Following an unrecorded interview during the afternoon of July 20, appellant complained of illness and requested to see a doctor. She was taken to Ben Taub Hospital at 6:50 p.m. and again treated for heroin withdrawal, this time receiving twenty-five milligrams of Librium at 10:07 p.m. Appellant was discharged at 11:00 p.m. and escorted back to police headquarters in downtown Houston.

A final video-taped interrogation commenced at 11:38 p.m. During this interview, appellant stated that Snider forced her into the house on the return trip, making her hold one of his two guns. Although she denied aiming at any of the complainants, she stated that Snider pulled the trigger a number of times while she held the gun in her hand. The interrogation ended at 1:39 a.m. on July 21. Appellant was then returned to her jail cell. The record does not show that she complained of illness following the interview.

### The Suppression Hearing

In a pretrial hearing, appellant moved to suppress all three recorded statements. Although advised of her Fifth Amendment rights before each interview, appellant complained that her statements were rendered involuntary because of medications she ingested and because she was suffering from acute opioid withdrawal.

Appellant called a single expert witness, Dr. George S. Glass, a physician board certified in psychiatry and addiction medicine. Dr. Glass testified that appellant was a heroin addict with a very high tolerance for narcotics. He stated that heroin has a short half-life, meaning that it breaks down in the body relatively quickly. If the addiction is not sustained, an abuser can suffer from withdrawal between four and eight hours after her last injection. The physical symptoms of withdrawal, he said, include chills, fever, shaking, nausea, vomiting, and seizing.

Dr. Glass assumed that appellant's last use of the drug prior to her arrest occurred between 10:00 a.m. and 12:00 p.m. on July 19. Based on that time frame, he supposed that appellant would have entered serious opioid withdrawal between 4:00 p.m. and 8:00 p.m. that evening. Dr. Glass observed the first video-taped interrogation, which ended just before 4:00 p.m., and opined that appellant was in acute withdrawal because she was wrapped in a thin blanket and shaking.

Dr. Glass also described the drug treatment appellant received following her arrest. He said that six milligrams of morphine was a significant dosage normally reserved for intense pain, similar to the type of pain experienced by an adult male during a heart attack. Methadone, however, is commonly used when treating opioid dependence. The drug has a much longer half-life than heroin, and patients who take Methadone will not usually enter maximum withdrawal until twenty-four hours after it was last ingested. Dr. Glass also stated that the high dosage of Methadone demonstrated the extent of appellant's heroin addiction—the average person would have been comatose on that dosage if not similarly tolerant to the drug.

Dr. Glass explained that Librium is a minor tranquilizer also used in treating addictions. The drug removes the anxiety of withdrawal, but it does nothing for the cravings or for certain physiological symptoms, such as vomiting, nausea, diarrhea, and bone aches. According to Dr. Glass, appellant's dosage of Librium was the equivalent of consuming three to five shots of alcohol.

Dr. Glass testified that appellant was not intoxicated during her third interview in Houston. However, he opined that she did exhibit certain withdrawal symptoms, referencing a moment where she mentioned a desire to throw up. Dr. Glass observed shaking and anxiety, testifying that appellant's posture was "a little bizarre," as though her muscles were in spasm. Because appellant received her last dosage of Methadone more than twenty-six hours before this interview, Dr. Glass found her symptoms consistent with a person entering the peak of withdrawal.

The State produced testimony from three police officers. Sergeant Brian Harris executed the arrest warrant and conducted the two recorded interviews in San Antonio. He testified that he has been a certified peace officer for twenty-one years. During his tenure on the police force, he personally observed the effects of heroin on users, which he claimed are typically marked by irrational behavior and slurred and incoherent speech. He has also observed the physical breakdown of a person entering withdrawal.

According to Sergeant Harris, appellant did not appear to be under the influence of narcotics at the time of her arrest. During the first recorded interview, he stated that appellant was clear and calm, and her tone suggested an inquisitive demeanor. He testified that appellant did shake occasionally, but only when she was crying, which occurred during the interview's more sensitive discussion of the complainants, who appellant revealed were her friends and classmates. Sergeant Harris denied seeing any signs of intoxication. When questioned whether appellant deliberated before giving her answers, he described her responses as "calculated."

Sergeant Harris accompanied appellant on her transfer to Santa Rosa Hospital. He testified that appellant was relaxed and conversational during the hospital interview. He described her answers as clear and concise. Despite her treatments of morphine and Methadone, Sergeant Harris testified that appellant did not appear to be under the influence of any sort of intoxicant. Rather, he stated she was conscious and alert, and she made appropriate hand gestures when communicating her story.

Officer Connie Park managed the intake desk at the Houston Police Department on the night of July 20, 2006. Officer Park testified to having twelve years of experience with the police department, four of which were spent on the Gang Task Force. During those four years, she encountered a number of people who were impaired by the influence of drugs.

Sometime between 5:30 p.m. and 6:30 p.m. on July 20, Officer Park was asked to escort appellant to the bathroom, where they had a casual conversation. Officer Park testified that during their brief discussion, she observed none of the signs of impairment that typically accompany drug abuse. Officer Park described appellant's speech as "clearly coherent" and "matter of fact." In her view, appellant appeared to be oriented to time and place, and neither upset nor distraught. She also testified that appellant made no complaints about withdrawing from heroin.

Sergeant Breck C. McDaniel conducted the video-taped interview in Houston. He testified to having thirteen years of experi-

ence with the Houston Police Department. In that time, his work has involved some exposure with heroin addicts. He stated that heroin is a depressant, and addicts tend to appear tired or lethargic. He also testified that he has witnessed the symptoms of withdrawal, which primarily include vomiting, seizing, sweating, and visible illness.

Sergeant McDaniel testified that appellant displayed none of these symptoms during her interview. Occasionally, appellant did seem upset. When she recounted the shootings, for instance, her hands shook and she began to cry. Sergeant McDaniel allowed her frequent breaks to compose herself, even permitting her to smoke and drink a soda. According to him, she appeared physically fine and lucid throughout the interview.

The trial court denied appellant's motion to suppress. The court later issued findings of facts, which stated that the testimony from Sergeant Harris, Officer Park, and Sergeant McDaniel was credible and reliable. In the findings, the court also concluded that appellant was not intoxicated or suffering from withdrawal symptoms, and that during all three interviews, she was "lucid and capable of understanding the warnings given to her and the nature of her statements." Furthermore, the court specifically found that Dr. Glass's opinions were "not supported by the evidence and therefore not reliable." Because the court determined that appellant voluntarily waived her rights in supplying her statements, all three recordings were later published for the jury's consideration.

### The Trial

Two eyewitnesses placed appellant at the scene of the crime. Michelle and Craig Lackner lived next door to Tiffany Rowell. The Lackners testified that on the day of the offense, they both observed a young man and woman casually walk down the street and approach Rowell's house. In court, the Lackners identified appellant as the girl they had witnessed. They denied seeing her with a gun, but they each said that she was carrying a purse. Using a six-person photo spread, the Lackners also identified Snider as the accompanying male.

Rott was called as a witness for the prosecution as well. He testified to calling in the tip to Crime Stoppers after learning of the offense from his wife. Rott said that he met appellant at a drug treatment center in Kerrville around November 2004, more than a year after the murders. The two were married about four months later. During their courtship, appellant vaguely told him of an incident with her former boyfriend that resulted in the deaths of four people. On a later occasion, she elaborated that she and Snider went to Rowell's house in Clear Lake. Just before entering the house, Snider handed her a gun, which she carried in her purse. The intention was to take some drugs and money, but not hurt anyone, she stressed.

According to Rott, appellant mentioned that she and Snider were invited into Rowell's house, where they eventually started shooting at the four people inside. After leaving, appellant told Snider that she needed to make sure they were really dead. Appellant then returned to find Koloroutis choking on her own blood. Rott testified that appellant admitted to beating Koloroutis with her gun until she was dead.

Bullets from two separate weapons were recovered at the scene. Kim Downs, the State's firearms examiner, testified that bullets from both sets of guns were found in the bodies of Rowell and Precella. The bullets were later traced to two handguns found in Louisville, Kentucky, in a safe stored at the home of Snider's stepfather.

Dr. Morna Gonsoulin, the State's medical examiner, testified that in addition to several gunshot wounds, Koloroutis suffered skull fractures consistent with blunt force trauma to the head.

Part of appellant's defensive strategy was to attack Rott's credibility. In his opening statement, defense counsel suggested that Rott reported his wife to Crime Stoppers in order to claim a substantial reward. Defense counsel further argued that Rott made a deal with the State to testify falsely against appellant so that he might avoid prosecution for the heroin recovered in the San Antonio hotel. Defense counsel attempted to elicit testimony regarding this deal from Thomas Pardue and his daughter, Lane, a woman whom Rott began to date following appellant's arrest. Much of the Pardues' testimony was interrupted by various objections from the State.

During closing argument, defense counsel again referred to Rott's alleged deal with the prosecution and his relationship with the Pardues. The trial court sustained the prosecutor's objection to these arguments as being outside the record. The prosecutor then responded to these exact arguments in his own closing statement. The prosecutor told the jury:

> Mr. Pardue. I feel sorry for that man, I truly do. I mean, he has gone through hell for his daughter, but you don't get to know everything. You probably figured out by now you cannot know all the facts and circumstances of a case. You hear us making objections, you've got to go outside the room, come back inside the room. You don't know the whole truth about everything that happened in this case. When it's all over, we will tell you the whole truth.

Appellant objected that this argument improperly encouraged the jury to convict her on facts not admitted in evidence.

The objection was sustained, and the trial court instructed the jury to disregard the statement. The trial court further admonished that "the only thing you can base your verdict on is the evidence that you have in front of you." Appellant also moved for a mistrial, but that was denied.

The jury returned a verdict of guilty after receiving the trial court's instruction on the law of parties. Appellant was then sentenced to a mandatory term of life imprisonment.

## ISSUES PRESENTED

In her first issue, appellant contends a mandatory life sentence violates the Eighth Amendment's proscription against cruel and unusual punishment when imposed on a juvenile offender. In her second issue, she contends the trial court abused its discretion by denying her motion for mistrial. In issues three through six, she contends the trial court erred in dismissing the opinions of Dr. Glass and in denying her motion to suppress. We examine these issues slightly out of order, considering her second issue last.

## CRUEL AND UNUSUAL PUNISHMENT

At the time of the offense, section 12.31 of the Texas Penal Code stated that "[a]n individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the institutional division for life." Act approved June 19, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3602 (amended 2009). Appellant contends this automatic sentence is grossly disproportionate as applied to juveniles because it forecloses the opportunity of producing evidence of mitigating circumstances.

We have previously held that a mandatory life sentence does not amount to cruel and unusual punishment, even when applied to juvenile offenders. *See Laird v. State*, 933 S.W.2d 707, 714 (Tex.App.-Houston [14th Dist.] 1996, pet. ref'd) ("Presumably, the law statutorily considers youth in mitigation of the death penalty and thereby mandates the lesser of the two possible punishments for capital murder."). Appellant now urges us to reach the opposite conclusion in light of recent Supreme Court decisions. In particular, appellant relies on *Graham v. Florida*, —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), and *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), two cases which recognized that juvenile offenders should not be punished as harshly as their adult counterparts.

In *Graham*, the Supreme Court determined that the Eighth Amendment proscribes a sentence of life without parole for a juvenile offender convicted of a non-homicide crime. *Graham*, 130 S.Ct. at 2034. In *Roper*, the Court ruled that the Eighth Amendment similarly prohibits the imposition of capital punishment on juveniles. *Roper*, 543 U.S. at 578, 125 S.Ct. 1183. Both cases observe that juveniles are inherently different from adults, and because of their innate differences, the Court reasoned that a punishment that is permissible for adults may occasionally be disproportionate when applied to younger offenders. *See Graham*, 130 S.Ct. at 2026 (noting that juveniles have an objective lack of maturity, underdeveloped sense of responsibility, vulnerability to negative influences, and unformed characters); *Roper*, 543 U.S. at 569–70, 125 S.Ct. 1183 (same). Because the Texas capital murder statute did not distinguish between adults and juvenile offenders at the time of her offense, appellant contends her mandatory sentence is likewise disproportionate.

Appellant raises an issue not directly addressed by either *Graham* or *Roper*: whether a mandatory sentence of life with the possibility of parole may be imposed on a juvenile convicted of a capital offense. When faced with a categorical challenge to a term-of-years sentence, the reviewing court must first consider the "objective indicia of society's standards, as expressed in legislative enactments and state practice." *Roper*, 543 U.S. at 563, 125 S.Ct. 1183; *see also Graham*, 130 S.Ct. at 2022–23 (applying *Roper*'s categorical rules where "a threshold comparison between the severity of the penalty and the gravity of the crime does not advance the analysis"). The court examines this objective evidence to determine whether a national consensus exists against the sentencing practice at issue. *See Roper*, 543 U.S. at 563, 125 S.Ct. 1183. Although "entitled to great weight," evidence of national consensus is not itself determinative of whether a punishment is cruel and unusual. *Kennedy v. Louisiana*, 554 U.S. 407, 434, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008). Because the task of interpreting the Eighth Amendment remains a judicial responsibility, the court must still exercise its independent judgment to determine whether the punishment violates the Constitution. *Roper*, 543 U.S. at 575, 125 S.Ct. 1183. This judgment is guided by consideration of the moral culpability of the offenders at issue in light of their crimes and characteristics, the severity of the punishment, and whether the punishment serves legitimate penological goals. *Graham*, 130 S.Ct. at 2026; *cf. Meadoux v. State*, 325 S.W.3d 189, 194 (Tex.Crim.App. 2010) (applying the same factors to a challenge involving a juvenile capital offender who was sentenced to life without the possibility of parole).

Balancing all of these factors, we cannot conclude that appellant's mandatory sen-

tence amounts to cruel and unusual punishment. Appellant has not produced any evidence of a national consensus against the sentence imposed. Even though a juvenile's culpability may be diminished when compared to that of an adult, the Texas Court of Criminal Appeals has recently recognized that the moral culpability of a juvenile capital offender is still substantial. *See Meadoux*, 325 S.W.3d at 195.

In *Meadoux*, the Court of Criminal Appeals affirmed a juvenile capital offender's mandatory sentence of life without parole. *See id.* at 195–96 (finding that the punishment served legitimate penological goals). Following *Meadoux*, we cannot conclude that appellant's lesser sentence is grossly disproportionate simply because the capital murder statute did not distinguish between juveniles and adults at the time of the offense. Appellant's first issue is overruled.

## MOTION TO SUPPRESS

In issues three through six, appellant contends the trial court should have suppressed her three recorded statements.

The recording of an interrogation may not be introduced into evidence unless the defendant knowingly, intelligently, and voluntarily waives her Fifth Amendment rights. Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a) (West 2005); *Miranda v. Arizona*, 384 U.S. 436, 444, 474–75, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant argues that waiver was involuntary in this case because her recorded statements were procured as she was either withdrawing from heroin or under the influence of morphine, Methadone, and Librium.

We examine a trial court's ruling on a motion to suppress using a bifurcated standard of review. *Wilson v. State*, 311 S.W.3d 452, 457–58 (Tex.Crim.App.2010). We afford "almost total deference to a trial court's determination of historical facts," especially when the trial court's findings are based on an evaluation of the credibility and demeanor of the witnesses. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim. App.1997). If supported by the record, the trial court's ruling will not be disturbed. *Romero v. State*, 800 S.W.2d 539 (Tex.Crim.App.1990). The only question we review de novo is whether the trial court properly applied the law to the facts presented. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App.2000).

The voluntariness of a statement is assessed by considering the totality of the circumstances under which the statement was obtained. *Creager v. State*, 952 S.W.2d 852, 855 (Tex.Crim.App.1997). Of principal concern are the characteristics of the accused and the details of the interrogation. *Davis v. State*, 313 S.W.3d 317, 337 (Tex.Crim.App.2010). Although relevant, evidence of intoxication does not necessarily render a statement involuntary. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim.App.1996); *King v. State*, 585 S.W.2d 720, 722 (Tex.Crim.App. [Panel Op.] 1979). When the record reflects evidence of narcotics, medications, or other mind-altering agents, the question becomes whether those intoxicants prevented the defendant from making an informed and independent decision to waive her rights. *See Jones*, 944 S.W.2d at 651; *see also Nichols v. State*, 754 S.W.2d 185, 190 (Tex.Crim.App. 1988) ("The central question is the extent to which appellant was deprived of his faculties due to the intoxication."), *overruled on other grounds by Green v. State*, 764 S.W.2d 242 (Tex.Crim.App.1989).

We recognize that appellant's drug abuse was significant, and her medical treatment considerable. Nevertheless, the record supports the trial court's ruling that appellant was capable of making an informed decision to waive her rights. Ap-

pellant did not appear intoxicated at any stage of her three recorded interrogations. Sergeant Harris testified that appellant spoke clearly and concisely during both interviews in San Antonio. During her first interview, appellant's responses were described as "calculated." At the hospital, Sergeant Harris said she was conscious and alert. Officer Park testified that appellant was oriented to her surroundings, and Sergeant McDaniel testified that she was physically fine and lucid during her Houston interview. All three officers testified to having experience dealing with heroin addicts, and each denied witnessing any signs that appellant was withdrawing from heroin or under the influence of any sort of intoxicant. The court, as trier of fact during the suppression hearing, was free to believe the officers over the testimony of the expert. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986).

Although we defer to the trial court's finding that Dr. Glass's opinions were not credible, *Guzman,* 955 S.W.2d at 89, we do observe that Dr. Glass similarly testified that appellant was not intoxicated from any of the drugs she received. Even if appellant was further suffering from the effects of withdrawal, as Dr. Glass claimed, the evidence does not support appellant's argument that she was unable to make an informed decision to waive her rights. *Cf. Davis,* 313 S.W.3d at 337–38 (finding waiver voluntary despite confessor's testimony that he was "coming off" drugs where confessor was calm and exhibiting a rational understanding of the questioning); *United States v. Kelley,* 953 F.2d 562, 565 (9th Cir.1992) (finding waiver voluntary despite symptoms of withdrawal where confessor was coherent, responsive, and displaying an ability to think rationally), *disapproved on other grounds by United States v. Kim,* 105 F.3d 1579 (9th Cir. 1997). We find support for the testimony

of the officers in our own review of the recordings. We therefore conclude that the record supports the trial court's conclusion that appellant voluntarily waived her rights.

■ Appellant still argues that her statements should have been suppressed under the authority of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). In *Townsend,* a heroin addict confessed to murder after receiving treatment with a drug having the properties of a "truth serum." *Id.* at 297–98, 83 S.Ct. 745. The drug was administered because the addict was entering opioid withdrawal. *Id.* The Supreme Court held that a "coherency" standard was not the appropriate test for determining whether a drug-induced statement was voluntarily made. *Id.* at 320, 83 S.Ct. 745. Rather, the appropriate inquiry is whether the individual's will was overborne, or whether his statement was the product of a rational intellect and a free will. *Id.* at 307, 83 S.Ct. 745. Appellant argues that the trial judge's findings should be disregarded because he used the wrong standard.

We do not find that appellant's recorded statements were admitted in violation of *Townsend.* Appellant may have very likely been under the influence of heroin during her first interrogation, yet no one, including Dr. Glass, actually testified that she appeared intoxicated. Moreover, Dr. Glass never testified that heroin by itself was sufficient to abrogate appellant's free will. *See King,* 585 S.W.2d at 722 (holding that heroin taken on day of confessing did not render confession involuntary).

Dr. Glass also failed to explain how any of the medications appellant received acted in the nature of a "truth serum." He

merely testified that appellant was treated with morphine and Methadone to begin her detox and to stabilize her condition before her transfer to Houston. Although appellant received potent dosages of each drug, no one testified that either morphine or Methadone would render appellant incapable of understanding her rights. After receiving this treatment, appellant did not slur her words during the second interview. She did not pause inappropriately before answering a question, nor did she seem confused. Nothing on the audio recording indicated that appellant was incompetent to testify. Likewise, there was no testimony that the combined effect of morphine and Methadone had overcome appellant's free will, making her appear competent when, in fact, she was not.

Before her third recorded interview in Houston, appellant received Librium to treat the anxiety associated with her heroin withdrawal. Dr. Glass testified that the amount of Librium administered was the equivalent of several shots of alcohol, and that it did nothing for the physical symptoms of withdrawal. Dr. Glass agreed with the officers, however, that appellant was not intoxicated when she offered her statements. Moreover, Dr. Glass never testified that Librium would prevent appellant from waiving her rights freely and knowingly.

The record supports the trial court's finding that appellant's statements were not induced from either the medications she received or the effects of withdrawal. Because her recorded statements were not admitted in violation of *Townsend*, we overrule issues three through six.

## MOTION FOR MISTRIAL

In her last remaining issue, appellant challenges the trial court's refusal to grant a mistrial after the prosecutor's improper closing argument.

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App.2004). When the refusal to grant a mistrial follows an objection for improper jury argument, we evaluate the trial court's decision using the following factors: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct. *Id.* (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998)). Balancing these factors in the light most favorable to the trial court's ruling, we conclude that the trial court did not abuse its discretion in denying appellant's motion for mistrial.

When assessing the severity of an improper jury argument, our primary focus is the prejudicial effect of the misconduct. *Id.* In deciding whether prejudice was incited, we examine the statement "in light of the facts adduced at trial and in the context of the entire argument." *See McGee v. State*, 774 S.W.2d 229, 239 (Tex. Crim.App.1989); *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex.Crim.App.1988); *see also Wood v. State*, 18 S.W.3d 642, 648 (Tex.Crim.App.2000) ("The determination of whether a given error necessitates a mistrial must be made by examining the particular facts of the case.").

Argument that places the jury outside the record has always been held to be improper. *See Everett v. State*, 707 S.W.2d 638, 641 (Tex.Crim.App.1986). The prosecutor's remarks in this case are no exception. But despite being highly inappropriate, we cannot conclude that the argument was clearly prejudicial when taken in context. The argument followed defense counsel's own closing statement where he claimed that Rott made a deal with the State to testify falsely against appellant. Testimony of this side deal was limited during trial because of various objections from the State. The prosecutor

referenced these very objections just before his remark that the jury cannot know "the whole truth about everything that happened in this case." The immediate discussion was focused entirely on the questions surrounding Rott's alleged deal, not appellant's involvement in the murders. Viewed in this context, even though the prosecutor did venture outside the record, his argument did not introduce a risk that the jury would convict appellant on facts not in evidence. At most, the argument suggested that an agreement did exist between Rott and the State. As this could only damage Rott's credibility, we do not believe that the prosecutor's argument was so prejudicial as to warrant a mistrial.

 In considering the second factor, we generally presume that a prompt instruction to disregard will cure any error associated with improper jury argument. *Phillips v. State*, 130 S.W.3d 343, 356 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd). "Only offensive or flagrant error warrants reversal when there has been an instruction to disregard...." *Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex.Crim.App.2000). In this case, the trial court promptly instructed the jury to disregard the prosecutor's statement, adding further that the jury should only consider evidence that has actually been admitted. The prosecutor's argument was not extreme or in violation of a mandatory statute, and it did not inject any new facts into the case that were harmful to appellant. *Cf. Thompson v. State*, 89 S.W.3d 843, 850–51 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd) (holding prosecutor's argument was improper where it encouraged the jury to speculate on "a very important reason" he could not legally disclose). Accordingly, we do not believe that the argument was so blatant as to render the curative instruction ineffective. *See Wesbrook*, 29 S.W.3d at 115.

Finally, even if the prosecutor's argument did encourage the jury to speculate on facts not in the record, evidence of appellant's participation in the murders was already well-substantiated. For instance, the Lackners witnessed appellant casually approaching Rowell's house on the day of the murders. In her third recorded statement, appellant herself admitted to being inside the home and holding a gun as her boyfriend pulled the trigger. Bullets from both guns used in the murders ultimately struck two of the complainants. Although this evidence may not be suggestive of direct guilt, we cannot say that the prosecutor's argument affected the likelihood of appellant's conviction as a party to the murders.

Having considered each of the factors adopted in *Hawkins*, we conclude the trial court did not abuse its discretion by denying appellant's motion for mistrial. Appellant's second issue is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.