**Affirmed and Opinion filed August 18, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-15-00236-CR

---

**BRANDON JOSEPH WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 149th District Court
Brazoria County, Texas
Trial Court Cause No. 71723**

---

## O P I N I O N

A jury convicted appellant Brandon Joseph Williams of murder and assessed his punishment at sixty-seven years' confinement and a $10,000 fine. Appellant timely appealed. We affirm.

# I.   BACKGROUND

Appellant does not dispute the fact that he shot the decedent; he only disputes why he did it—that is, whether he formed the requisite intent to murder. Thus, the facts are virtually undisputed.

Appellant, an Army veteran, shot and killed Veta Karla Conrad (Karla). According to appellant's mother, Belinda Sue Williams (Sue), appellant shot Karla while Karla and Karla's daughter, Sarah, were living with appellant at Sue's residence in Lake Jackson, Texas. Karla and Sarah were sharing Sue's bedroom while Sue slept on the living room couch; appellant had his own bedroom. On the night of the shooting, appellant, who had been using drugs—including synthetic marijuana and methamphetamine—woke Sue and said, "Mom, I hear something outside." Appellant told his mother to take Karla and Sarah, who were both asleep in their bedroom, into the bathroom. Sue did not want to scare Karla or Sarah, so she told appellant, "No." Appellant then went through the kitchen and out the backdoor.

Sue did not hear the backdoor close, so she rose and moved toward the living room fireplace in order to see out the backdoor. She saw appellant standing in the breezeway by the garage. Appellant appeared startled when he noticed her and fell backwards. Appellant then raised and pointed his gun at Sue and advanced toward her, yelling "get down on the ground." Sue walked backwards to a lamp in the living room, turned it on, and screamed, "It's me, mom." Appellant continued to approach, re-entered the house, and kept shouting at Sue to get on the ground. Frightened, Sue got down on one knee. Sue then heard a pop and thought she had been shot. She did not realize that Karla had entered the room behind her; Karla was hit by a single bullet fired from appellant's gun. When she realized she had not been shot, Sue lunged at appellant and tackled him; the gun "went flying" out of

2

his hand. Sue struggled to keep appellant on the ground as Sarah walked into the living room. Sue shouted at Sarah to call 911. She also yelled at Sarah to "tell 911 that it was PTSD." Sue struggled to hold appellant down until the police arrived.

## II.    ANALYSIS

Appellant challenges his murder conviction in four issues. In his first issue, appellant urges that the evidence was insufficient to convict him of murder because the State failed to establish the requisite mental state for murder. In his second issue, appellant contends that the trial court erred by denying his pretrial motion to suppress his oral confession because, in light of his claim to have been suffering from post-traumatic stress disorder (PTSD), his confession was not made knowingly, intelligently, and voluntarily. In his third issue, appellant argues that the trial court erred by excluding expert testimony during the guilt/innocence phase concerning his mental illness, PTSD. Finally, in his fourth issue, appellant urges that the trial court erred by rejecting certain lesser-included offense instructions in the jury charge.

We first generally outline Texas law concerning mental illness as a defense or as rebutting evidence. We then address appellant's issues in the order he presents them and conclude that (1) the evidence is legally sufficient to support appellant's conviction for murder; (2) the record, and particularly the video recording of appellant's statement, supports the trial court's conclusion in the amended findings of fact and conclusions of law that appellant made his statements after a knowing, intelligent, and voluntary waiver of his legal rights; (3) the trial court did not abuse its discretion in excluding expert testimony of PTSD that did not negate the *mens rea* for murder; and (4) appellant has waived his complaint about the lesser-included offense instructions through inadequate briefing.

## A.    Mental Illness: Insanity vs. Diminished Capacity

Texas law begins with the presumption that a criminal defendant is sane and that he intends the natural consequences of his acts. *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008). However, a defendant may be excused from criminal responsibility if he proves, by a preponderance of the evidence, the affirmative defense of insanity. Tex. Penal Code § 8.01(a) ("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."). The insanity defense excuses the defendant from criminal responsibility even though the prosecution has proven every element of the particular offense, including the culpable mental state, beyond a reasonable doubt. *Ruffin*, 270 S.W.3d at 592. And, when insanity is relied upon as a defense, evidence of insanity is admissible as a matter of due process because "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

Apart from the insanity defense, upon which appellant does not rely in this case,[1] Texas does not recognize any other diminished capacity *affirmative defense* to criminal responsibility. *See Ruffin*, 270 S.W.3d at 592. Instead, diminished capacity is a simple failure-of-proof defense in which a defendant argues that the State has failed to establish that, at the time of the offense, the defendant had the requisite state of mind. *See Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). Therefore, "both lay and expert testimony of a mental disease or defect that directly rebuts the particular *mens rea* necessary for the charged offense is relevant and admissible unless excluded under a specific evidentiary rule." *Ruffin*, 270 S.W.3d. at 587–88 (reaffirming the holding in *Jackson*, 160 S.W.3d at 568).

---

[1] Appellant's experts evaluated his mental condition prior to trial and determined him to be (1) competent to stand trial and (2) not eligible for an insanity defense.

Our court has had few occasions to apply *Jackson*'s teachings regarding use of diminished-capacity evidence. *See Jackson*, 160 S.W.3d at 574–75 (holding that a trial court has the discretion to determine whether evidence of mental illness is relevant to negate the element of *mens rea* and, if admitted, whether such evidence raises the issue of a lesser-included offense); *see also Burks v. State*, No. 14-05-00921-CR, 2007 WL 2386321, at *10–11 (Tex. App.—Houston [14th Dist.] Aug. 23, 2007, no pet.) (mem. op., not designated for publication) (applying *Jackson* and determining that evidence of the appellant's mental disease actually provided the culpable mental state to support the offense charged). Our court has had no occasion to apply the evidentiary teachings of *Ruffin*. *Ruffin*, 270 S.W. 3d at 587–88. Therefore, we examine those cases here to provide a framework for our analysis of appellant's substantive issues.

In *Jackson*, Jackson killed his brother following a fight. 160 S.W.3d at 569–70. Jackson presented evidence that he suffered from paranoid schizophrenia and bipolar disorder. *Id.* After reviewing the proffered evidence of Jackson's illness and the testimony that Jackson was aware of what he was doing and knew the difference between right and wrong, the Court of Criminal Appeals concluded that the evidence did not negate the *mens rea*. *Id.* at 572 (stating that evidence that "presented an excuse for the crime, i.e., that Appellant killed his brother because he was so paranoid that he thought his brother was out to get him" does not negate the intent to kill).

In *Ruffin*, Ruffin was "charged with first-degree aggravated assault by shooting at ten police officers during an armed 'standoff' on his rural property." 270 S.W.3d at 587. This offense as charged required the State to prove that Ruffin intended to shoot a police officer. *Id.* at 594 & n.25. After conviction, Ruffin appealed the trial court's decision to exclude expert testimony that he was

suffering from severe delusions at the time of the offense and, thus, "believed that he was shooting at Muslims, not police officers." *Id*. at 587. He further argued that the expert testimony about his delusions negated the *mens rea* element that the persons he was shooting at were police officers and that the evidence would "support his theory that he was guilty only of the lesser-included offense of second-degree aggravated assault." *Id*. at 591. The Court of Criminal Appeals agreed and reversed because the expert's testimony was "clearly relevant to the issue of whether appellant intended to shoot at police officers during the standoff or whether, because of a mental disease and the delusions that he suffered as a result of that disease, he believed he was shooting at Muslims or some other figment of his mind." *Id*. at 596.

The Court of Criminal Appeals further explained the *Jackson* rule in *Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010), involving an appeal from a conviction of killing a law enforcement officer during a shootout. In reliance upon *Ruffin*, Mays argued that his mental illness, including paranoid ideation, entitled him to a diminished capacity instruction regarding whether he acted intentionally or knowingly. *Id*. at 380–81. The Court disagreed. The Court noted that Mays' expert testified that paranoia does not prevent someone from acting intentionally or knowingly, though the person is "'influenced by the disordered thoughts.'" *Id*. at 375. Thus, the Court concluded, the evidence went to motive for killing, rather than to *mens rea*. *Id*. at 380–81. As such, the paranoia that led Mays to believe the officers mistreated him pertains to mitigation in punishment, not culpability. *Id*. at 381.

Because there is evidence that appellant used drugs shortly before the shooting, we also discuss voluntary intoxication. The Court of Criminal Appeals has repeatedly rejected attempts to use evidence of voluntary intoxication to rebut

6

or disprove a defendant's *mens rea*. *See Ramos v. State*, 547 S.W.2d 33, 33–34 (Tex. Crim. App. 1977) (declining appellant's invitation to "overrule a long line of cases" to hold that "'he was intoxicated to such an extent, that he failed to have the requisite intent necessary to commit burglary'"); *see also Davis v. State*, 313 S.W.3d 317, 328–29 (Tex. Crim. App. 2010) (holding inadmissible expert's testimony, "offered at the guilt stage of trial, to show that appellant's intoxication from cocaine use prevented him from forming the applicable *mens rea*"); *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997) (reaffirming that Texas Penal Code § 8.04(a) forbids *evidence* of voluntary intoxication to negate the culpable mental state of a crime). With this framework in mind, we turn to appellant's issues.

## B.     Sufficiency of the Evidence

In his first issue, appellant does not challenge the sufficiency of the evidence to show he caused the death of Karla. Rather, he urges there is insufficient evidence that he could have formed the requisite intent to kill because he suffers from PTSD.

We view all of the admitted evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury is the exclusive judge of the credibility of witnesses and the weight to be given to the evidence. *See Isassi*, 330 S.W.3d at 638. Further, we defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence. *Id.* We draw all reasonable inferences from the evidence in favor of the verdict. *Id.*

"[A] person commits the offense of murder if (1) he intentionally or knowingly causes the death of an individual; or (2) he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." *Gilbert v. State*, __S.W.3d__, No. 14-15-310-CR, 2016 WL 889314, at *2 (Tex. App.—Houston [14th Dist.] Mar. 8, 2016, pet. ref'd). A person acts intentionally with respect to the result of his conduct when it is his objective to cause the prohibited result, and a person acts knowingly with respect to his conduct when he is aware that his conduct is reasonably likely to cause the prohibited result. Tex. Penal Code § 6.03(a), (b); *Nadal v. State*, 348 S.W.3d 304, 310 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Intent to kill may be inferred from the use of a deadly weapon. *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012); *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986).

A firearm is a deadly weapon per se. Tex. Penal Code § 1.07(a)(17)(A). Therefore, the jury was entitled to infer intent from appellant's use of a deadly weapon, his firearm, "'unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result.'" *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992) (quoting *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986)). Furthermore, "'[i]f a deadly weapon is used in a deadly manner, the inference is almost conclusive that the [defendant intended] to kill." *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) )alterations in original) (quoting *Godsey*, 719 S.W.2d at 581).

Here, the evidence shows that appellant used a deadly weapon in a deadly manner. In his recorded interview, appellant acknowledged that he shot someone. He never stated that his gun accidentally discharged or that he did not intend to fire his weapon. No other witness suggested that the gun accidentally discharged.

Sue testified that she believed appellant had been suffering from PTSD or having a "flashback" when he shot Karla. But Sue also acknowledged that appellant had been out of the military for approximately three years and he had never suffered such an episode before. Therefore, she made an assumption that his behavior was from PTSD. However, Sue acknowledged that, at the time of the shooting, she was unaware that appellant had used, and had been using, illegal drugs in the house. She was surprised and disappointed when the officers found drugs in appellant's room. The jury was not required to credit appellant's mother's testimony about her belief that he was suffering a flashback or PTSD. *See Isassi*, 330 S.W.3d at 638; *see also Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (explaining that, even if uncontradicted, a jury is not required to believe the testimony of a defendant's mother; "She is, after all, the defendant's mother."). But, even if credited, nothing in Sue's testimony suggests that appellant did not intend to fire his weapon.

We conclude that appellant's claims of mental illness and intoxication fit squarely within the Texas Court of Criminal Appeals' analysis in *Mays*; i.e., this evidence provides at best an excuse for the offense, rather than negating *mens rea*. 318 S.W.3d at 381. It is undisputed that appellant used drugs shortly before he shot Karla. He admitted to officers that he had used both methamphetamine and marijuana, and he tested positive for both amphetamines and cannabis, a derivative of marijuana. The attending emergency room physician who treated appellant shortly after this offense testified that because appellant's heart rate, blood pressure, and respiratory rate were so elevated from the drugs, the physician administered an abnormally high level of benzodiazepines to bring appellant's vital signs back to normal.

It is further undisputed that appelant intended to shoot at Karla, even if he did not appreciate at the time that it was Karla. In his statement, appellant says he turned around and saw a figure. He told the figure to put its hands up. He directed the figure to identify itself. And then he fired one round. Unlike *Ruffin,* in which specific intent to kill police officers was an element of the offense, a specific intent to kill Karla is not required in this case.

Under these facts, the evidence is sufficient for the jury to infer appellant's intent to kill by his use of a deadly weapon. *See Cavazos*, 382 S.W.3d at 384; *see also Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999) (holding testimony that appellant meant to shoot victim "in the butt" established that appellant intended to cause serious bodily injury and, therefore, established that appellant was guilty of murder under section 19.02(b)(2)). We therefore overrule appellant's first issue.

## C. Motion to Suppress

In his second issue, appellant contends the trial court erred in denying his motion to suppress his recorded statement. Specifically, appellant claims he was unable to effectively waive his rights because his statement was given while suffering from PTSD and the duress of hallucinations, illness, and medications.

### 1. Standard of Review and Governing Law

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). We give almost total deference to the trial court's determination of historical facts and to the trial court's application of law to fact questions that turn upon credibility and demeanor. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). Whether a statement is voluntary is a mixed question of law and fact that may depend upon

10

credibility and demeanor. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000).

The trial court is the sole finder of fact and judge of the credibility of witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007). This deferential standard similarly applies when the trial court's determinations are based on a video recording admitted into evidence at a suppression hearing. *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). When the trial court signs findings of fact, as here, we view the evidence in the light most favorable to the trial court's ruling and determine whether the record supports the trial court's findings. *Banda v. State*, 317 S.W.3d 903, 907 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

There are three theories whereby a defendant may claim that his statement was involuntary: (1) failure to comply with article 38.22; (2) failure to comply with *Miranda v. Arizona*, 384 U.S. 436 (1966); or (3) violation of due process rights. *Umana v. State*, 447 S.W.3d 346, 350 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (citing *Oursbourn v. State*, 259 S.W.3d 159, 169–72 (Tex. Crim. App. 2008)). "Under the second and third theories, a confession is involuntary 'only when there is police overreaching.'" *Id.* (quoting *Oursbourn*, 259 S.W.3d at 169).

> Absent police misconduct causally related to the confession, there is no deprivation of due process of law by a state actor and therefore no violation of the Due Process Clause. Likewise, *Miranda* protects against government coercion to surrender Fifth Amendment rights. Thus, due-process claims and *Miranda* claims of involuntariness involve an objective assessment of police behavior.

*Id.* (citing *Oursbourn*, 259 S.W.3d at 170–71).

When a defendant claims his confession was involuntary due to his state of mind, those claims are "'to be resolved by state laws governing the admission of

evidence.'" *Id.* (quoting *Oursbourn*, 259 S.W.3d at 171). In Texas, that state law is article 38.22, the Texas Confession Statute. *Id.* While claims of involuntariness under article 38.22 may certainly be based on police overreaching, they may also be based on the defendant's state of mind. *Id.*

Under Section 6 of the Texas Confession Statute—the "general voluntariness" provision—a defendant may claim that his or her statement was not freely and voluntarily made and thus may not be used as inculpatory evidence. *See Oursbourn*, 259 S.W.3d at 169. "The voluntariness of a statement is assessed by considering the totality of the circumstances under which the statement was obtained." *Paolilla v. State*, 342 S.W.3d 783, 792 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). "The totality of the circumstances includes the accused's experience, background, and conduct. It also includes the characteristics of the accused." *Umana*, 447 S.W.3d at 351 (citations omitted).

Whether the defendant is mentally ill is only one characteristic to consider among many others when evaluating the voluntariness of a confession. *Id.* (citing *Dela v. State*, 235 S.W.3d 235, 239–40 (Tex. Crim. App. 2007)). "A confession is involuntary if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will." *Id.* (citing *Vasquez v. State*, 179 S.W.3d 646, 655 (Tex. App.—Austin 2005), *aff'd*, 225 S.W.3d 541 (Tex. Crim. App. 2007)).

Although relevant, evidence of intoxication does not necessarily render a statement involuntary. *Paolilla*, 342 S.W.3d at 792; *see also Oursbourn*, 259 S.W.3d at 173 (intoxication is usually not enough by itself to render a statement inadmissible, but it is a factor to consider). When there is evidence of the defendant's use of narcotics, medications, or other mind-altering agents, the question becomes whether those intoxicants prevented the defendant from making

an informed and independent decision. *Paolilla*, 342 S.W.3d at 792 (citing *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996)).

## 2. The Trial Court's Findings and Conclusions

The trial court made the following written amended findings of fact:

- The Defendant failed to present any evidence of coercive or improper police misconduct nor was he deprived of any basic necessities.

- The Defendant was properly advised of his legal rights in conformity with *Miranda* and article 38.22, section 2(a) of the Code of Criminal Procedure prior to his videotaped statement.

- The Defendant's video statement shows at the beginning of the interview Lt. Paul Kibodeaux told him, "We're in here because you asked to talk with us." The Defendant did not dispute that statement and was recorded shaking his head affirmatively in response to the question.

- The Defendant did not appear intoxicated as a result of ingestion of alcohol, controlled substances, or drugs of any type at the time of the recorded interview. To the contrary, the Defendant communicated appropriately with the officers during the interview. He described the delusions he claimed to have experienced before, during, and after the offense, but did not indicate he was experiencing any delusions during the interview. Further, the Defendant did not appear to experience and did not display symptoms of any type of withdrawal from any controlled substances at the time of the interview.

- Finally, at no time during the interview did appellant request an attorney or ask that the interview be stopped.

Based on its findings of fact, the trial court made amended conclusions of law, summarized below:

- The Defendant was capable of making an independent and informed decision to speak with investigators regarding the charged crime at the time of the videotaped interview. He was competent to understand and waive his legal rights at the time of the videotaped interview.

- The evidence does not show the Defendant was intoxicated at the time he made his statements to investigators; in particular, the evidence fails to show appellant was impacted by any level of intoxication sufficient to impair his understanding of his *Miranda* and statutory rights such that he could not make an independent, informed, and volitional decision to waive his rights and make a free and voluntary statement to the officers.

- The Defendant knowingly, intelligently, and voluntarily waived his legal rights under article 38.22, § 2(a) of the Code of Criminal Procedure prior to and during his videotaped interview, and freely and voluntarily gave all statements made on the video.

## 3. Analysis

The trial court's findings are supported by the record. The testimony and video-recording of appellant's statement confirm that it was appellant who requested to speak with investigators. Following this request, the video-taped statement shows two officers, Sidebottom and Kibodeaux, questioning appellant. Kibodeaux read appellant his *Miranda* rights and asked, "Do you understand these rights?" Appellant nodded his head and though not entirely audible, appears to say, "Yes sir." Moreover, when asked what appellant wanted to discuss, he responded by describing what took place before being arrested.

14

This court addressed an argument similar to appellant's in *Umana*, where the defendant argued he suffered from mental illness during his statement and thus did not provide the statement voluntarily. 447 S.W.3d at 349. In *Umana*, the defendant was convicted of aggravated sexual assault. *Id.* About sixteen hours after the assault, the defendant waived his rights and gave a video-recorded statement to police. *Id.* Days later, a judge ordered a psychological review of the defendant, as he reported hearing voices and had a prior diagnosis of bipolar disease and schizophrenia. *Id.* Five months after the offense, the defendant was found to be incompetent to stand trial and was admitted to North Texas State Hospital for psychiatric treatment. *Id.* Four months later, the defendant was again evaluated and found competent to stand trial. *Id.* The trial court denied the defendant's motion to suppress the statement. *Id.* We held that ruling was not an abuse of discretion, relying upon the video-taped statement as evidence of the appellant's state of mind at the time he provided that statement. *Id.* at 357.

Here, too the video-recorded statement shows that appellant appears to understand what is being said to him, that he "knew what was going on," "seemed to understand what the officer was asking him," and "did not appear to be hallucinating or out of touch with reality during the video." *See id.* (quotations omitted). Appellant made the statement approximately twelve hours after he shot Karla and after receiving emergency treatment to restore his vital signs to normal. Furthermore, like the defendant in *Umana*, appellant was able to communicate and speak in sentences that made sense. *See id.*

Specifically, when Kibodeaux asked what appellant wanted to talk about, appellant proceeded to say that while he did not know what happened back at his residence, he knew he shot somebody. Then appellant paused and said that he told Sue, Karla, and Sarah to go to the back bedroom and stay on the floor so he would

15

know where everyone was and "they didn't do it." At that point, appellant expressed how down he had been feeling. One of the officers began speaking, but appellant stopped him, saying "let me follow it from here."

From this point, appellant described being down over time, doing drugs, and getting further and further away from God. He warned the officers that his story was "gonna sound stupid" even though he knew the officers hear "all kinds of wild stories." Appellant described that he had argued and fought with the devil, that the devil had tried to take over his body, that he heard voices, and that he had no control over his body. After explaining that the devil was angry with him, he described the events of the night culminating in him—armed with a gun—turning to see a figure, telling the figure to put its hands up, and then directing the figure to identify itself. Appellant then said he fired one round.

Appellant cried intermittently when describing the "bits and pieces" that he could remember. He expressed remorse for killing Karla. But there is no indication in the seventy-two-minute interview that appellant was continuing to "fight with the devil" during the interview or was otherwise not in control. And, unlike *Umana*, appellant was never declared incompetent to stand trial.

Under the totality of the circumstances, the evidence amply supports the trial court's finding that appellant voluntarily waived his rights before giving his statement. Accordingly, we hold the trial court did not abuse its discretion in denying appellant's motion to suppress. Appellant's second issue is overruled.[2]

## D.    Exclusion of Expert Testimony

---

[2] Appellant also appears to complain that the issue of voluntariness should have been submitted to the jury under article 38.22 section 6 of the Texas Code of Criminal Procedure because a reasonable jury could have concluded his statement was not voluntarily made. But the jury was given the instruction appellant complains was missing. Because the jury was instructed under article 38.22 section 6, this portion of appellant's issue is without merit.

In his third issue, appellant contends the trial court violated his due process right to present a defense by excluding expert testimony regarding alleged mental illnesses he was suffering from at the time of the offense. Specifically, appellant argues that the testimony was admissible to show the impaired condition of his mind at the time of the offense and tended to negate the requisite culpable mental state. Appellant argues the testimony was admissible under article 38.36(a) of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.36(a). We review a trial court's decision to exclude evidence of mental illness for an abuse of discretion. *Jackson*, 160 S.W.3d at 575. We will not reverse the trial court's ruling unless it falls outside the zone of reasonable disagreement. *Resendiz v. State*, 112 S.W.3d 541, 544 (Tex. Crim. App. 2003).

As we noted previously, appellant's evidence is not pertinent to a *defense* because appellant did not assert an insanity defense. Instead, appellant necessarily offered the evidence to negate the culpable mental state for murder. Thus, the excluded evidence must negate culpable mental state or show that appellant's mental illness prevented him from forming (a) the intent to cause the death of an individual or (b) the intent to cause an individual serious bodily injury where his act causes the death of that individual. Stated differently, the excluded evidence must do more than provide an excuse or justification for appellant forming such intent; it must show that appellant was *prevented* from forming the intent.

Appellant argues that the "proffer presented by Appellant of the doctors' testimony directly negated the *mens rea* element required to convict Appellant of murder." Murder is a "result-of-conduct" crime, which the Penal Code defines in terms of the result of the perpetrator's actions. *See Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011) (observing that "result of conduct" offenses concern the product of certain conduct). A person commits murder by (1) intentionally or

17

knowingly causing the death of an individual or (2) with intent to cause serious bodily injury, committing an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code § 19.02(b)(1), (2).

Appellant made an oral proffer of the testimony of the three expert witnesses he sought to introduce.[3] The Texas Court of Criminal Appeals has authorized such an offer of proof by "counsel's concise statement [including] a reasonably specific summary of the evidence offered and [stating] the relevance of the evidence unless the relevance is apparent." *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998) (per curiam) (interpreting Tex. R. Crim. Evid 103(b)); *see also Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009) (applying *Warner* to Tex. R. Evid. 103(b)).

Appellant's offer of proof on the opinions of Dr. Axelrad, a forensic psychiatrist, included that "Brandon was experiencing significant psychotic symptoms on or around the time of the commission of the offense against the victim in this matter." Appellant stated Dr. Axelrad would have testified that "Brandon does not recall providing the statement to the police officers"; that "Brandon did tell him that he was using Kush and a little methamphetamine 15 to 30 minutes before the commission of the offense"; and that "Brandon did recall the gun being discharged but he did not have an actual recollection of pulling the

---

[3] In his brief, appellant argues that "the doctors' reports stated that, due to his mental diseases, Appellant was incapable of forming the intent to kill Veta Conrad or incapable of acting with knowledge of his conduct and its consequences." Appellant did not offer any doctors' reports at the time of the offer of proof. As such, the content of those reports cannot form a basis for showing the trial court abused its discretion in excluding the evidence in the guilt/innocence phase. Appellant did offer Dr. Axelrad's and Dr. Fuller's reports when those witnesses testified in the punishment phase, but the trial court excluded them as hearsay. Appellant brings forward no issue about the exclusion of the reports or any restriction on any opportunity to make the reports part of the guilt/innocence offer of proof. We note that although the reports were excluded as evidence, they appear in our reporter's record but do not contain any opinion about appellant's inability to form intent, as suggested.

18

trigger on the gun which resulted in the death of the victim Veta Karla Conrad."
Finally, Dr. Axelrad's testimony would, according to the proffer, confirm that
Axelrad's review of the records of the Brazoria County Detention Center revealed
they were "consistent with Dr. Axelrad's psychiatric evaluation and the attending
mental health professionals that arrived at a diagnosis of a major depressive
disorder and post-traumatic stress disorder." Finally, the proffer revealed

> [w]ith regard to the mental health status examination, Dr. Axelrad
> found significant evidence of marked anxiety and depression during
> the course of his clinical psychiatric interviews, that -- that it would be
> apparent from the -- after interviewing Mr. Williams at the time of the
> offense, he was suffering from post-traumatic stress disorder,
> unspecified depressive disorder, cannabis abuse disorder, severe
> alcohol use disorder moderate [sic] at the time of the commission of
> the offense against Ms. Conrad.

The proffer contained nothing from Dr. Axelrad about appellant's ability or
inability to form the intent to kill Karla or his capacity to act with knowledge of his
conduct and its consequences.

Appellant's offer of proof on the opinions of Dr. Fuller, also a forensic
psychiatric, was that, using the DSM-4 criteria, appellant's score "is suggestive of
PTSD." The proffer contained nothing from Dr. Fuller about appellant's ability or
inability to form the intent to kill Karla or his capacity to act with knowledge of his
conduct and its consequences.

Appellant's offer of proof on the opinions of Dr. Harrison, a
neuropsychologist, was that appellant has severe motor problems, movement tics,
vocalization, and nail-biting, and that appellant had childhood attachment
problems, pathological concerns, and preoccupations with his safety and that of his
mother. Dr. Harrison concluded that appellant had ADHD and possible Tourette's
Syndrome, PTSD, an adjustment disorder, and a drug-induced psychotic disorder.

19

The proffer contained nothing from Dr. Harrison about appellant's ability or inability to form the intent to kill Karla or his capacity to act with knowledge of his conduct and its consequences.

The proffered expert testimony neither addressed nor negated the *mens rea* element required to convict appellant of murder. As such, it was not relevant and the trial court did not abuse its discretion in excluding the evidence during guilt/innocence. *Ruffin*, 270 S.W. 3d at 587–88. Accordingly, appellant's third issue is overruled.

## E.    Lesser-Included Offense Instructions

In his fourth issue, appellant contends that the trial court erred by denying his request for lesser-included offense instructions. He argues he was entitled to a charge on lesser-included offenses, including voluntary manslaughter, criminally negligent homicide, aggravated assault, and deadly conduct.

We review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). The determination of whether a lesser-included offense instruction requested by a defendant should be given to the jury requires a two-step analysis: "First, the court determines if the proof necessary to establish the charged offense also includes the lesser offense." *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). Second, "[i]f this threshold is met, the court must then consider whether the evidence shows that if the Appellant is guilty, he is guilty *only* of the lesser offense." *Id.* (emphasis added). The first step is a question of law and does not depend on the evidence produced at trial. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011). "The credibility of the evidence, and whether it conflicts with other evidence, must not be considered in deciding whether the charge on the

20

lesser-included offense should be given." *Dobbins v. State*, 228 S.W.3d 761, 768 (Tex. App.—Houston [14th Dist.] 2007, pet dism'd) (citing *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992)). However, an appellant is not entitled to an instruction on a lesser-included offense merely because the jury could have disbelieved certain evidence; instead, there must be some evidence "directly germane to the lesser-included offense." *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011).

The State does not dispute that all of the lesser-included offenses referenced fall within the offense of murder in this case. Thus, we need only analyze the second prong. However, appellant has provided the court no citations to any portion of the record containing evidence germane to the four requested lesser-included offenses. Appellant's argument on the second prong, *in toto*, follows: "This Court can only conclude the record contains a mountain of evidence that Appellant was only guilty of either lesser-included offense, and not guilty of murder."

Appellant cites no authorities relevant to the particular instructions and provides no substantive analysis concerning these instructions. *See* Tex. R. App. P. 38.1(i) (brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities"). Appellant provides neither legal citation nor argument concerning the standard for establishing harm under *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g).

Under these circumstances, appellant's brief is inadequate, and we overrule his fourth issue on this basis. *See Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996) (overruling inadequately briefed issue because it is "incumbent upon counsel to cite specific legal authority and to provide legal argument based upon that authority").

### III. CONCLUSION

Having overruled each of appellant's issues, we affirm the trial court's judgment.

/s/     Sharon McCally
Justice

Panel consists of Justices Christopher, McCally, and Busby.
Publish — Tex. R. App. P. 47.2(b).