

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00080-CR

COY JAKE JONES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 4th District Court
Rusk County, Texas
Trial Court No. CR21-396

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

A Rusk County jury convicted Coy Jake Jones (Coy) of the first-degree murder[1] of Kristi Collier, and after a trial on punishment, Coy was sentenced to thirty-five years in prison. On appeal, Coy argues that the evidence was legally insufficient to prove the culpable mental state of "intent." Because we find that the jury's verdict was supported by legally sufficient evidence, we affirm the trial court's judgment.

## I.      Background

According to the testimony of Coy, on or about July 28, 2021, he and his live-in girlfriend, Collier, were at their Rusk County home arguing about their new puppy. Collier got up to take the dog outside. Intending to go outside with her, Coy picked up his pistol off the nightstand. Coy claimed that a fight escalated before they could leave the bedroom and that Collier attacked him. However, when he tried to block one of her strikes, the gun in his hand discharged, shooting Collier in the chest and causing her death.

The State indicted Coy on a single charge of first-degree murder, alleging that Coy "with intent to cause serious bodily injury . . . commit[ted] an act clearly dangerous to human life" by shooting Collier with a firearm, causing her death. In response to the State's claims, Coy claimed that he did not intend to shoot Collier, that the shooting was an accident. The Rusk County jury rejected Coy's claims and found him guilty of first-degree murder. After a trial on punishment, the trial court sentenced Coy to thirty-five years in prison.

---

[1]TEX. PENAL CODE ANN. § 19.02(b)(2) (Supp.).

**II.    The Evidence Was Legally Sufficient to Support the Jury's Verdict**

In his sole point of error, Coy contends that the evidence is legally insufficient to prove that he intended to shoot Collier. We disagree. There was sufficient evidence for a rational jury to find that the State proved, beyond a reasonable doubt, its allegation that Coy shot Collier with intent to cause serious bodily harm.

**A.    Standard of Review**

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)).

In drawing reasonable inferences, the jury "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). The jury is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may

"believe all of a witness['] testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that decision is based on an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Paroline v. State*, 532 S.W.3d 491, 498 (Tex. App.—Texarkana 2017, pet. struck) (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). We consider all the evidence admitted at trial, even improperly admitted evidence. *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

Legal sufficiency of the evidence is measured "by the elements of the offense as defined by a hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or

4

unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

### B. Analysis

To obtain a guilty verdict under Section 19.02(b)(2), the State had to prove, beyond a reasonable doubt, that Coy (1) intended (2) "to cause serious bodily injury" and (3)(a) "commit[ed] an act clearly dangerous to human life" (b) "that cause[d] the death of [Collier]." TEX. PENAL CODE ANN. § 19.02(b)(2). Coy only challenges the sufficiency of the evidence of the culpable mental state of "intended," arguing that he did not intentionally shoot Collier and that his actions were the result of accident or recklessness. Because he does not challenge the remaining elements of the offense, we address only the element of intent.

### 1. The Evidence at Trial

Jimmie Jones, Coy's stepmother, called 9-1-1 after the shooting. A recording of the telephone call was admitted into evidence and played for the jury. Jimmie said that Coy came to their house, was "crazy," and said that he had killed Collier.

Sergeant Nathan Parker of the Rusk County Sheriff's Department testified that, at about 10:00 p.m. on July 27, he was dispatched to a residence off County Road 481 because the sheriff's office had received a call from Jimmie, in which she told the dispatcher that Coy had told her that he had killed Collier. When Parker arrived at the home, he knocked on the door and the side of the house. He then contacted Sergeant Russell Smith of the Henderson Police Department because Smith was trying to locate Coy. Smith told Parker that he had found Coy at

5

a restaurant, had spoken with him about Collier, and had informed him that the sheriff's office wanted to speak with him. Smith then stated that Coy had fled the scene.[2]

When Smith tried to speak with Coy, he denied that he was Coy Jones, stated that his girlfriend was at his house, refused to speak any further, and fled the scene on foot. Smith informed Parker of what happened. After speaking with Smith, Parker kicked open the home's rear door, entered the home, and found Collier's dead body on the floor. Parker did not attempt to render aid to Collier because he "could see that she was deceased." The recording of Parker's body-camera footage from when he entered the home was admitted into evidence and played for the jury. Law enforcement agents spent several hours looking for Coy but were unable to find him.

Investigator James Whitaker of the Rusk County Sheriff's Office went to and searched Collier's home, and he testified that it appeared that Collier had suffered a gunshot wound. Although he did not find a weapon, he did find several .22 caliber shell casings in the bedroom near her body, as well as a knife stabbed down into the bedroom mattress and a "digital recording device on the dresser." Whitaker admitted that he was unable to say whether the spent shell casings or the knives found in the house had "anything to do with th[e] alleged crime."

Deputy Cody Runnells of the Rusk County Sheriff's Office testified that an arrest warrant had been issued for Coy. Runnells drove the area where Coy was last seen, and he saw a man seated at a pavilion table. Runnells called him "Mr. Jones," and the man acknowledged that, so Runnells placed the man, who was later identified as Coy, under arrest. Coy was taken into

---

[2]Smith's encounter with Coy was recorded on the officer's body camera, and that recording was admitted into evidence.

custody without incident. He did not display any marks, injuries, or bleeding. Runnells searched Coy and found thirteen unspent rounds of .22 caliber ammunition, some credit cards with the name "Kristi Collier" on them, two pocketknives, and a small, loaded, semiautomatic pistol that had an unspent round in the chamber.

Dr. Danielle Armstrong testified that she performed the autopsy of Collier. The body had a gunshot wound on the right side of the chest, and the wound was remarkable because it had soot on it, which, she testified, was "generally seen in a close gunshot wound. So generally less than two inches." The gun shot injured Collier's lung and aorta, which "would be [the] cause of death." A bullet was removed from Collier's body during the autopsy. Armstrong testified that Collier's body had two wounds on it, an abrasion and a contusion on the right arm and a small abrasion on the left arm, but there were no marks or injuries on her hands. Collier's blood was tested, and it was found to contain a high amount of methamphetamine—600 nanograms per milliliter—as well as differing amounts of diphenhydramine and lorazepam. Armstrong admitted that methamphetamine levels from "200 to 600 have been reported in methamphetamine abusers who exhibited violent and irrational behavior."

Ricardo Ramirez, a forensic scientist with the Texas Department of Public Safety Crime Laboratory, testified that the gun found was capable of firing .22-caliber projectiles. Having tested the action and safety of the weapon, Ramirez testified that the gun was not capable of being accidentally discharged—a round had to be chambered and the trigger pulled in order to fire it. He explained that it would take five to eight pounds to depress the trigger to make the gun in this case fire. Ramirez examined the evidence and found that the spent shell casings in

7

evidence were fired from the .22 handgun in evidence. He compared the bullet taken from the body during the autopsy to the known test fires from the pistol and found that it had "some of the same class characteristics," but there "were not enough individual characteristics" to establish that the bullet was fired from that particular .22 handgun as opposed to another of the same make. Ramirez could not definitively link the bullet taken during the autopsy to any of the spent shell casings in evidence.

Judy Hogan, Collier's mother, testified that Collier had struggled with methamphetamine addiction for a long time. She admitted that Collier had been admitted to Glen Oaks Hospital in Greenville, but she did not know that Collier had been diagnosed with "bipolar disorder, depressed with severe psychosis."

Coy's son, Coy Jake Jones, Jr. (Junior), twenty-three years of age, testified that he had known Collier for nine or ten years because she was his father's girlfriend. On multiple occasions, he had observed Collier "push, hit, scream, [and] holler" at his father and throw things. He testified that, when those things happened, his father would try and walk away or go outside and work. He recalled that, on July 27, 2021, after receiving a telephone call from Teresa Garrison, he went to his grandfather's house where he saw his father. Junior testified that Coy; his grandfather, Robert Jones; and Robert's wife and Junior's step grandmother, Jimmie, were all there. He described his father as being "in shock" and not in his normal state of mind. Coy said that he and Collier had gotten into an "argument," she had hit him with a soda can, and "they just wrestled . . . and then the gun went off." Junior said that his father told him that he had been "to Shreveport and back after it happened." Even though Junior did not know that

8

Collier was dead, Junior urged his father to turn himself in to the police, but when Coy refused, Junior drove his father to the Jalapeno Tree restaurant and dropped him off there. Junior did not know that Jimmie had called the police and did not know that law enforcement might be looking for his father.

Jimmie testified that, when Coy came to her home that night, he was "all over the place," saying he wanted Mexican food and asking her to keep his dog, but he did not tell her anything else. She stated that Coy was at her house for about an hour and a half, that he spoke with Robert for about an hour, and that Coy "was just talking out of his head." From the way Coy was behaving and speaking, Robert thought Coy was under the influence of a "drug or something." Coy told Robert that "he had killed his girlfriend." When Robert inquired about it, Coy said that he was holding the gun and that "she was trying to get the gun, and he was trying to keep her from getting the gun, and the gun went off." Robert "told [Jimmie] what was going on," and it was then that she called 9-1-1. Coy was present during the call when Jimmie told the 9-1-1 dispatcher that "[Coy] said he killed his girlfriend."

Robert and Jimmie also testified regarding Collier and her relationship with Coy. Jimmie testified that, during one incident, Coy went to "pay his probation" and Collier "lost it." Jimmie offered to take Collier home, but Collier jumped out of Jimmie's truck when she saw Coy driving up in Collier's car. "[S]he ran to the car, jerked the car door open," and attacked Coy. "She was trying to kill him. She was hitting him in the face, everything." Jimmie testified that Collier told them all that "she was going to kill him." Robert testified that he had seen Collier display a "temper or bad behavior" on two different occasions. The first time, he saw and heard

9

Collier hitting Coy in the backseat of the vehicle they were in, and the second time, Collier "went after" his ex-daughter-in-law.

Coy took the stand in his own defense and testified that he loved Collier and that he did not intentionally kill her. He asserted that it was an accident and that he was not guilty of murder. He testified that he and Collier had lived together for eight to ten years and treated each other as if they were married. He worked as a plumber, she stayed at home, and they shared their credit cards and money.

Coy met Collier at a time when she was living at a homeless shelter, where she had been dropped off by her mother after Collier was unable to continue drug rehabilitation treatment. Coy admitted that he and Collier had abused drugs together in the past and that, on the day in question, she had smoked methamphetamine. Coy testified that Collier had shown aggressive behavior toward him "[m]ore times than [he] [could] count"; however, he claimed that when she would attack him, he would not fight back.

Coy testified that, for the last two months of her life, Collier had threatened to harm or kill herself, warning him not to leave his gun lying about the house. He had tried to get her some mental help during their relationship, as he "took her to [a] mental hospital several times."

Coy admitted that the .22 pistol in evidence belonged to him. He and Collier would go target shooting together, and she knew how to handle and shoot a firearm. He testified that Collier had shot at people before and that she had "a pending indictment against her for a felony deadly conduct for [discharging] a firearm at a passing car." He also admitted that he had "a pending indictment against [him] for aggravated assault [with a deadly weapon]."

10

Coy explained that, on the night in question, he and Collier had smoked some marihuana and then were smoking cigarettes while sitting on the bed. He was aggravated and complaining because their new puppy had urinated on the bed. Collier got up to let the puppy outside, and Coy was going to go outside with her, so he picked up his gun off of the nightstand. He testified that he did not want to leave the gun where she could get her hands on it.[3]

Coy also explained that Collier was "still coming down" from her high that morning, she got angry about Coy's complaints regarding the dog, she spit her mouthful of soda into his face, and then she "chunked the [can and the] rest of the content at [him]." As he tried to get up off the bed, she came at him and started "hitting [him] in the jaw" while he tried to block her strikes. He stated that, "when [they] made contact, the firearm went off." He then testified that she was "trying" to hit him. Coy maintained that pulling the trigger was accidental. However, on cross-examination, he admitted that she did not actually hit him that night. As noted above, Coy later told Robert that Collier was "trying to get the gun" when it "went off."

After the shot, Collier said, "[Y]ou shot me." Coy claimed that he "freaked out" and was "crying." He laid her down on the floor near the foot of the bed, "she was still trying to talk," and he tried talking to her until her demise. He remained with Collier and checked her vital signs, but she had no pulse and was not breathing. At first, he claimed that "[i]t seemed like forever" before she quit breathing. However, he later claimed that it did not take her "really very long at all" to die and that she "died within minutes." He could not explain why he failed to call emergency services.

---

[3]Coy testified that the gun was loaded with the safety off and that, at all times, he kept the gun under his control.

11

After the shooting, Coy took his dog, drove to Shreveport, and checked into a motel. He smoked some marihuana and drank beer until he passed out. When he awoke, he drove to his father's house in Henderson, Texas, and smoked some marihuana on the way. When he arrived at his father's house, he spoke with Jimmie and then his father for a while before his son took him to a local restaurant, where he intended to have one final meal before he turned himself in to the authorities. He admitted to running from Smith who spoke with him at the restaurant. Coy said that, if he had to do it all over again, he would have called 9-1-1 rather than running.

### 2. Intent

"A person acts intentionally . . . with respect . . . to a result of his conduct when it is his conscious objective or desire to cause the result." TEX. PENAL CODE ANN. § 6.03(a). "A jury may infer intent [or knowledge] from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime . . . ." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)). "Intent and knowledge are fact questions for the jury and (absent a confession) are almost always proven through evidence of the circumstances surrounding the crime." *Yates v. State*, 505 S.W.3d 631, 644 (Tex. App.—Texarkana 2016, pet. ref'd) (citing *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984)).

Coy admitted to the jury that he shot Collier, but he claimed that it was an accident. Coy testified that Collier was trying to hit him in the face during a struggle when the gun discharged, and there was testimony that Collier had a high level of methamphetamine in her system and that

12

she had a history of physically attacking Coy.[4] However, at the time Smith spoke with him and when he was arrested, the evidence demonstrated that Coy was not bleeding and did not have any injuries, bruises, or other marks indicating that he had been in a struggle. Coy admitted on cross-examination that Collier did not actually hit him that night. Even so, "evidence of a struggle does not necessarily negate [a finding] of deliberate conduct." *Adanandus v. State*, 866 S.W.2d 210, 216 (Tex. Crim. App. 1993).

"The specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result." *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992) (quoting *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986)). In fact, when a "deadly weapon is used in [a] deadly manner, the inference is almost conclusive that [the defendant] intended to kill." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986) (quoting *Hatton v. State*, 21 S.W. 679, 679 (Tex. 1893)). Additionally, "[w]here a deadly weapon is fired at close range and death results, the law presumes an intent to kill." *Watkins v. State*, 333 S.W.3d 771, 781 (Tex. App.—Waco 2010, pet. ref'd) (citing *Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981).

Here, it is undisputed that Coy shot Collier with a firearm.[5] Though Coy admitted the gun was in his hand during a confrontation, and the gun must have been pointed at Collier when it discharged a bullet into her body, Coy's testimony and the testimony of Robert left the jury

---

[4]Coy did not claim that he shot Collier in self-defense.

[5]"A firearm is a deadly weapon per se." *Rhymes v. State*, 536 S.W.3d 85, 98 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Williams v. State*, 502 S.W.3d 262, 270 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd)); *see* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (Supp.).

with contradictory explanations on the crucial issue of what, if any, contact with the victim caused the gun to be "accidentally" pointed at her and "accidentally" discharged. However, the jury's verdict of guilty shows that the jury implicitly rejected Coy's contention that the shooting was accidental.

Collier was also shot in the chest at very close range, which would allow the jury to infer that Coy fired the gun with intent to cause serious bodily harm. In addition, Coy left the scene of the shooting and fled to Shreveport, and he fled again when he was approached by police at the restaurant, which is also suggestive of guilt. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (explaining that evidence of flight evinces consciousness of guilt); *Hedrick v. State*, 473 S.W.3d 824, 831 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (reiterating that flight shows consciousness of guilt and that "[a] consciousness of guilt is perhaps one of the strongest kinds of evidence of guilt").

Having reviewed the record and considering the evidence in the light most favorable to the verdict, we hold that the evidence is legally sufficient for any rational jury to conclude that, in shooting Collier, Coy acted with intent "to cause serious bodily injury." *See* TEX. PENAL CODE ANN. § 19.02(b)(2). As a result, we overrule Coy's sole point of error.

### III.     Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:      November 28, 2023
Date Decided:        April 5, 2024

Do Not Publish